Clark, Appellant, v. Meade.

Argued January 13, 1954. Before STERN, C. J., STEARNE, JONES, BELL, CHIDSEY, MUSMANNO and ARNOLD, JJ.

reargument refused April 15, 1954.

*Abraham L. Freedman*, City Solicitor, with him *Ernest L. Nagy*, Assistant City Solicitor, *Abraham Wernick*, Deputy City Solicitor and *Jerome J. Shestack*, First Deputy City Solicitor, for Mayor of City of Philadelphia et al., appellants.

*Charles E. Kenworthey*, with him *Daniel J. McCauley, Jr.*, for Board of Revision of Taxes and Registration Commission, appellees.

*Herbert S. Levin*, with him *Joseph E. Gold, Grover C. Ladner* and *Gilbert Stein*, for City Commissioners and Sheriff, appellees.

*Harry F. Stambaugh*, Special Counsel, with him *Harrington Adams*, Deputy Attorney General, and *Frank F. Truscott*, Attorney General, for Commonwealth of Pennsylvania, under Rule No. 46.

*Robert B. Wolf* and *Robert T. McCracken* filed a brief for amicus curiae.

OPINION BY MR. JUSTICE ARNOLD, March 29, 1954:

These two appeals were argued together and will be treated in one opinion, the questions involved being common to both. The controversy is whether §5 of the Act of 1953, 53 PS §3422, is a valid constitutional enactment. In No. 91 January Term, 1954, the court below gave judgment for the plaintiffs against the Mayor of Philadelphia and the other defendants in a declaratory judgment proceeding.

In No. 90 January Term, 1954, the court below dismissed the complaint in mandamus brought by the Mayor of the City of Philadelphia et al. against the defendants, William F. Meade et al., constituting the Board of Revision of Taxes of the City of Philadelphia.

On April 17, 1951, the electors of the City of Philadelphia adopted the Home Rule Charter, effective January 7, 1952.[1] On November 6, 1951, the City-County Consolidation Amendment to the Constitution of Pennsylvania was adopted by the voters in a state-wide election.

The City-County Consolidation Amendment[2] provided in section 8, inter alia, that "(1) In Philadelphia all county offices are hereby abolished, and the city shall henceforth perform all functions of county government within its area through officers selected in such manner as may be provided by law"; that "(3) All laws applicable to the county of Philadelphia shall apply to the city of Philadelphia"; and that "(7) Upon adoption of this amendment all county officers shall become officers of the city of Philadelphia. . ."

The Philadelphia Home Rule Charter, section 7-100, placed all the employes of the city under civil service, and section 10-107 forbade political activity on the part of city officers and appointees.

Prior to the Act of 1953, 53 PS §3422, this Court, in *Lennox v. Clark,* 372 Pa. 355, 93 A. 2d 834, decided that by virtue of the City-County Consolidation Amendment, together with the civil service provisions of the Philadelphia Home Rule Charter, the former county officers and county employes automatically became subject to the Philadelphia Home Rule Charter then in effect concerning city officers and employes. This decision embraced the Board of Revision of Taxes of Philadelphia, the Registration Commission of Philadelphia, the County Commissioners and the Recorder of Deeds. That the office of Sheriff was included therein had been established by the decision in *Carrow v. Philadelphia,* 371 Pa. 255, 89 A. 2d 496.

[1] Adopted under Article XV, section 1, of the Constitution.

[2] Constitution, Article XIV, section 8.

Thereafter the legislature passed the Act of 1953, 53 PS §3422, et seq., §5 of which provides that the "Sheriff, City Commissioners, the members of the Board of Revision of Taxes and the members of the Registration Commission shall continue to be elected or appointed, organized and compensated, and shall continue to perform all duties and shall have all powers and authority, including, but not limited to, the power and authority to hire and remove employes, as were provided by the Constitution and the acts of Assembly in effect immediately preceding the adoption of Article XIV, Section 8 of the Constitution, *and the provisions now or hereafter contained in the Philadelphia Home Rule Charter relating to civil service and prohibiting political activities by officers and employes of the City of Philadelphia shall be inapplicable to the Sheriff, City Commissioners, Board of Revision of Taxes and members thereof and the Registration Commission and members thereof, and the subordinates and employes of such officers, board and commission.*" (Italics supplied).

The specific question involved in this case is whether §5 of the Act of 1953 constitutes a valid and constitutional enactment. On this question the appellants claim the sanction of section 8, sub-section 2, of the City-County Consolidation Amendment reading: "Local and special laws, regulating the affairs of the city of Philadelphia and creating offices or prescribing the powers and duties of officers of the city of Philadelphia, shall be valid notwithstanding the provisions of section seven of article three of this Constitution." That article and section forbid the general assembly to pass any local or special law concerning 28 subjects, including (1) "Regulating the affairs of . . . cities";[3]

---

[3] Clause 2.

and (2) "Creating offices, or prescribing the powers and duties of officers in . . . cities."[4] These two are written into section 8, sub-section 2, of the City-County Consolidation Amendment, and this in the language of Article III, section 7, of the Constitution. The other prohibitions of Article III, section 7, are deliberately omitted, which confirms the conclusion that clause 2 of the City-County Consolidation Amendment did not intend to alter, in any way, the remaining restraints of Article III, section 7. *Expressio unius est exclusio alterius.* See *Commonwealth v. Moir,* 199 Pa. 534, 537, 49 A. 351; *Commonwealth ex rel. Maurer v. Witkin,* 344 Pa. 191, 25 A. 2d 317.

Among the remaining clauses of Article III, section 7, of the Constitution, which, as we have said, are unaffected by section 8, sub-section 2, of the City-County Consolidation Amendment, are the following: "Incorporating cities . . . or changing their charters,"[5] and "Granting to any . . . individual any special or exclusive privilege or immunity . . ."[6] Section 5 of the Act of 1953 clearly offends both of these clauses.

That §5 of the Act of 1953 is a local law is obvious, because it relates in terms to the city of Philadelphia only. Indeed, it could not relate to any other city of the first class, if any, unless its charter provided for all these same offices (enumerated in §5 of the Act of 1953). That the Act is also a special act cannot be denied, for it clearly grants special privileges and immunities. Of all the city and county offices of the City of Philadelphia, only four were selected to be taken out of the City-County Consolidation Amendment, and only these four were exempted from the provisions of

---

[4] Clause 15.

[5] Clause 11.

[6] Clause 26.

the Charter itself. Section 5 of that Act joins elected officers, such as the Sheriff and County Commissioners, with appointive officers, such as the Board of Revision of Taxes and members of the Registration Commission. In addition, there is no rational, substantial ground for the classification attempted to be made. The offices classified in the Act have no characteristics distinguishing them from other county offices. The classification is therefore arbitrary. If the civil service and merit system is appropriate for the selection and retention of clerks and stenographers in city offices, what rational basis can there be for a legislative determination that employes performing precisely the same type of work, under the same pay and classification plan, are to be excluded from the merit system in the offices designated? And it is impossible to discover any reason for the pronouncement that a stenographer in the office of the District Attorney may be dismissed only for cause, but a stenographer of the same grade, receiving the same compensation, in the office of the Sheriff or the Board of Revision of Taxes may be dismissed arbitrarily.

Again referring to the City-County Consolidation Amendment, section 8, sub-section 2, the exemption concerning local and special laws means that such laws regulating the affairs of the city of Philadelphia are permitted if such laws do not impinge upon the other interdicted clauses of Article III, section 7, of the Constitution, pertaining to "incorporating cities . . . or *changing their charters*," and "granting to any . . . individual any special or exclusive privilege or immunity." In this case a special law regulating the affairs of the City of Philadelphia is valid providing it does not change the charter of the City of Philadelphia, or does not grant "to any . . . individual any special or exclusive privilege or immunity." This applies also

to that clause relative to "creating offices, or prescribing the powers and duties of officers in . . . cities."

The Act of 1953 clearly grants to individuals, in violation of the Article, a special or exclusive privilege or immunity. As we have said, by the terms of the Philadelphia Home Rule Charter, section 7-100, all the employes of the City were placed under civil service and merit rating, and under section 10-107 political activity on the part of city officers and appointees was forbidden. Under the *Lennox* and *Carrow* cases, the Sheriff, the Board of Revision of Taxes, the Registration Commission, the County Commissioners and the Recorder of Deeds automatically became subject to the Philadelphia Home Rule Charter regulating city officers and employes. By the terms of §5 of the Act of 1953, the civil service requirements and the prohibition against political activity by the Sheriff, City Commissioners, members of the Board of Revision of Taxes and the Registration Commission, and the employes of those offices, are declared to be inapplicable. Therefore an immunity is furnished in that the appointees of those offices are exempt from civil service and merit rating and from the prohibition against political activity. But in all other offices of the city, civil service and the prohibition against political activity of such employes are retained. Cf. *Wood v. Philadelphia,* 46 Pa. Superior Ct. 573; *Commonwealth ex rel. Graham v. Schmid,* 333 Pa. 568, 3 A. 2d 701; *Carney v. Lowe,* 336 Pa. 289, 9 A. 2d 418.

In No. 90 January Term, 1954, the dismissal of the complaint in mandamus is reversed; and there being no facts in dispute, the court below is directed to enter judgment in favor of the appellants, at the cost of the appellees.

In No. 91 January Term, 1954, the judgment of the court below is reversed and is here entered in favor of the appellants, at the cost of the appellees.

CONCURRING OPINION BY MR. CHIEF JUSTICE HORACE STERN, MR. JUSTICE JONES AND MR. JUSTICE CHIDSEY:

We fully concur in the opinion of the court and would not presume to add to the discussion were it not for certain obvious misconceptions that appear to have arisen in regard to the issue involved.

At the outset it is important to note that our present decision is necessarily confined to the one question presented by the instant appeals, namely, the constitutionality of Section 5 of the Act of August 26, 1953 (No. 433). We are not passing, either expressly or impliedly, upon the general power of the legislature to enact laws regulating the affairs of the ,City, nor upon the power of the Council of the City by resolution, approved by a vote of the people, to amend the Charter in any manner that may be desired, as provided by the First Class City Home Rule Act of April 21, 1949, P. L. 665. Nor is it within our right or power to volunteer an advisory opinion on questions concerning the Charter that are not presented for decision by the appeals before us.

It has been suggested that the result of the majority opinion will be to make it constitutionally impossible, even for the *people* of Philadelphia, to disestablish civil service or to permit the employees of some of the City departments, and not others, to be politically active. That question is likewise not here involved. But, since it has been injected into the discussion, it is not amiss to point out that we are neither holding nor even implying that a resolution of Council, approved by a vote of the people (the procedure for amending the Charter), is the passage of a law within the contemplation of Article III, Section 7, of the Constitution whose operative prohibitions are directed against the passage by the legislature of certain laws.

The question with which this case is concerned is whether the passage of the Act of 1953, being as the majority opinion clearly demonstrates a local and special law, violates two specific prohibitions of Article III, Section 7, of the Constitution, namely, changing the charters of cities, and granting special or exclusive privileges or immunities. It is argued that the City-County Consolidation Amendment authorizes the enactment by the legislature of laws respecting Philadelphia without restraint from these or, in fact, any of the inhibitions so specified in the Constitution. The fallacy of this contention appears upon a moment's reflection on the wording of the Amendment concerning local and special laws. All that the Amendment did in such regard was to lift the restraint on local and special legislative action with respect to merely the following two of the twenty-eight inhibited subjects listed in Section 7 of Article III, namely, "Regulating the affairs of counties, cities" and other municipal or political subdivisions and "Creating offices, or prescribing the powers and duties of officers in counties, cities" and such other subdivisions. That leaves untouched by the Amendment the twenty-six other prohibited subjects of legislation among which are the changing of charters of cities, towns or villages and the granting "to any corporation, association or individual any special or exclusive privilege or immunity . . ." As the majority opinion recognizes and plainly declares, both of those prohibitions are violated by the Act of 1953.

. The fallacy becomes all the more apparent when it is realized that the remaining prohibited subjects of local or special legislation embrace such matters as "granting divorces", "changing the law of descent or succession", "changing the rules of evidence in any judicial proceeding or inquiry before courts", "fixing

the rate of interest", "exempting property from taxation", "regulating labor, trade or manufacturing", etc. It seems too obvious for discussion that the Consolidation Amendment, by granting to the General Assembly the power by local and special laws to regulate the affairs of the city and create offices or prescribe the powers and duties of officers thereof, did not thereby confer power upon the legislature to enact separate and distinct laws for Philadelphia concerning, for example, the granting of divorces, the changing of rules of evidence in court proceedings, the fixing of the rate of interest, etc. And, if it be conceded, therefore, as it must, that the Consolidation Amendment does not authorize the legislature's enactment of local and special laws in violation of all *such* prohibitions, how can it be maintained that the Amendment *does* permit the passage of laws in violation of the two constitutional prohibitions here involved, which are equally not exempted by the terms of the Amendment?

It is argued that the power to regulate the affairs of cities necessarily and inherently involves the right to change their charters. If that were so, the inclusion in Section 7 of Article III of the inhibition against changing the charters of municipalities would have been unnecessary, the regulation of the affairs of municipalities having already been inhibited by the constitutional provision. Manifestly, many laws might be passed by the legislature regulating the affairs of cities without changing in any way the provisions of their charters, as is strikingly demonstrated by the very Act here under consideration. Sections 2, 3 and 4, the constitutionality of which is not challenged, enact very important provisions regulating the affairs of the City of Philadelphia without changing any of the provisions of the Home Rule Charter.

As to the granting of special privileges and immunities, it is beyond question, as the majority opinion correctly holds, that Section 5 of the Act of 1953 effects such a grant. Our cases are legion which proclaim the principle of constitutional law that, in order to support a grant of special privileges and a withholding of such privileges from others, there must be at least some semblance of a logical and reasonable basis for differentiation between the individuals or groups so relatively classified. In the present instance, the privilege of political activity is not granted, or denied, to *all* City employees or to certain defined classes of such employees, but merely to the employees of four particular City offices,—clearly an arbitrary selection since, as the majority opinion points out, those offices have nothing in common with one another nor any characteristics which distinguish them as a class from other offices all of which are now a part of the City government. While it is true that the ban of political activity was the established rule in offices of the former *City* of Philadelphia, whereas the employees of the offices of the *County* of Philadelphia were not restrained from engaging in political activity, that differentiation, permissible as it undoubtedly was as between the government of counties and the government of cities, clearly became unjustified when, by reason of the Consolidation Amendment, all County offices became City offices and thereby component parts of the municipal government.

We believe that the foregoing sufficiently demonstrates that all the contrary contentions to which we have referred fail to impair the majority opinion.

162

The effect of the majority opinion is the acme of legal sophistry, viz.: *to declare unconstitutional a constitutional amendment.*

Since Chief Justice MARSHALL'S opinion in *The Trustees of Dartmouth College v. Woodward,* 4 Wheat. (U. S.) 518, 4 L. Ed. 629, and *Brown v. Hummel,* 6 Pa. 86, 92, (see also 13 Am. Jur. 222, Sec. 77), the legal doctrine remains unchallenged that *in the absence of a constitutional prohibition,* a city acts as an agent of the state. It is invested with certain subordinate governmental functions for reasons of convenience and public policy. There is no such prohibition in the Pennsylvania Constitution. *Consequently, a city charter may be altered or revoked at any time at the pleasure of the Legislature.* The majority obviously concedes, as indeed it must, the existence of this doctrine. It is equally apparent that, unless a *subsequent constitutional amendment* provides otherwise, any act adopted by the Legislature affecting such a charter must be a constitutional act, i. e.: in accordance with the constitutional mandates of Article III, Section 7, which enumerates twenty-eight prohibitions as set forth in the majority opinion. See accurate and informative article by Thomas Raeburn White, Esq., on Constitutional Changes in Matters of Home Rule and Municipal Government in 25 Temple Law Quarterly 428.

What the majority decides is that Section 5 of the Act of August 26, 1953, P. L. 1476, 53 PS 3422, is unconstitutional because it violates the constitutional prohibition of Article III, Section 7, against (a) *Special* laws and (b) *Local* laws.

While apparently not controverted, a summary of the constitutional provisions and amendments must be considered in order to comprehend the scope and effect

of the highly technical objections to the legislative enactment questioned by the majority.

The constitutional amendment, Article XV, Section 1, which is the foundation of the present Philadelphia Home Rule Charter, adopted November 7, 1922, provides: ". . . Cities, or cities of any particular class, may be given the right and power to frame and adopt their own charters and to exercise the powers and authority of local self-government, *subject, however, to such restrictions, limitations, and regulations, as may be imposed by the Legislature. . . .*" (Italics supplied)

In pursuance to this constitutional amendment the Legislature, on April 21, 1949, P. L. 665, 53 PS 3421.1 et seq. granted to *"cities of the first class"* the right to frame, adopt and amend their own charters and authorized City Council, upon petition of citizens, to appoint a Commission to frame a new charter. The Commission so appointed submitted a proposed *"Philadelphia* Home Rule Charter" to the voters of Philadelphia who adopted it on April 17, 1951, effective January 7, 1952.

It is vitally important to observe that the power to frame a charter is not derived from the *Constitution* itself; the Constitution grants the right to the *Legislature* to enact legislation giving a city the right to adopt a home rule charter. In summary, then, the Constitution gave the Legislature the power to permit cities to have home rule. The Legislature exercised this power and granted permission to first class cities to adopt their own home rule charters. The only then existing first class city, viz.: *Philadelphia,* did adopt a home rule charter.

After the adoption by the City of Philadelphia of a home rule charter, there still existed dual sovereignty of city and county offices within the geographical area of Philadelphia. To eliminate this situation, the Constitutional Amendment, Article XIV, Section 8, was

passed by the *voters of the Commonwealth* on November 6, 1951. This amendment, commonly termed the *"Consolidation Amendment"*, expressly made county functions subject to the provision of Article XV, Section 1, of the Constitution (the section empowering the Legislature to grant home rule). Subsection 2 of Section 8 of this amendment provides: "(2) *Local and special laws,* regulating the affairs of the city of Philadelphia and creating offices or prescribing the powers and duties of officers of the city of Philadelphia, shall be valid notwithstanding the provisions of section seven of article three of this Constitution." (Italics supplied)

Section 5 of the Act of 1953, supra, (the subject of the present litigation) reads as follows: "The Sheriff, City Commissioners, the members of the Board of Revision of Taxes and the members of the Registration Commission shall continue to be elected or appointed, organized and compensated, and shall continue to perform all duties and shall have all powers and authority, including, but not limited to, the power and authority to hire and remove employes, as were provided by the Constitution and the acts of Assembly in effect immediately preceding the adoption of Article XIV, Section 8 of the Constitution, and the provisions now or hereafter contained in the Philadelphia Home Rule Charter relating to civil service and prohibiting political activities by officers and employes of the City of Philadelphia shall be inapplicable to the Sheriff, City Commissioners, Board of Revision of Taxes and members thereof and the Registration Commission and members thereof, and the subordinates and employes of such officers, board and commission."

The majority decides that since Section 5 of the Act made the home rule charter inapplicable to only four of the former county offices, the Act is unconstitutional on the ground that it is *special* legislation

prohibited by Article III, Section 7, of the Constitution. It overlooks, however, the effect of the subsequent Constitutional *Amendment*, Article XIV, Section 8, which specifically provides: "(2) *Local and special laws, regulating* the affairs of the city of Philadelphia and creating offices or prescribing the powers and duties of officers of the city of Philadelphia, shall be valid notwithstanding the provisions of section seven of article three of this Constitution." (Italics supplied)

Despite the distinct sanction by the voters of the entire Commonwealth in enacting the Constitutional Amendment, Article XIV, Section 8, curiously enough the majority decides, under the principle of *expressio unius est exclusio alterius*, that since only two of the twenty-eight constitutional prohibitions of Article III, Section 7, are enumerated in the *Consolidation Constitutional Amendment*, the remaining twenty-six are left as prohibitions. It is maintained that since one of the remaining twenty-six prohibitions is against special legislation *changing a charter*, Section 5 of the Act of 1953, supra, is unconstitutional.

Such a construction indeed leads to remarkable results. It does not give full effect to the will of the voters. The words "shall be valid notwithstanding the provisions of section seven of article three of this Constitution" obviously mean *all* of the provisions of Section 7 *inconsistent with the subsequent constitutional amendment*, viz.: Article XIV, Section 8 (2), and not only those enumerated. Should the majority be correct, a paradoxical result would necessarily follow: the Constitutional Amendment allows special legislation regulating the affairs of the city, creating offices, and prescribing powers and duties of officers of the city, but the majority says the charter cannot be changed by special legislation since the Constitutional Amendment does not include *changing a charter*.

The Philadelphia Home Rule Charter regulates the affairs of the city, creates offices, and prescribes powers and duties of officers of the city. When the Legislature enacts *special* legislation, permitted by the Constitutional Amendment, regulating the affairs of the city, creating offices, and prescribing powers and duties of officers of the city, the city charter is automatically changed. The position of the majority is, therefore, untenable. Subsection 2 of Section 8 of Article XIV must logically be held to include *all* of the provisions of Section 7 of Article III of the Constitution *inconsistent with the former*. It, therefore, necessarily follows that since the Legislature may constitutionally enact such *"special"* laws the prior constitutional requirement of reasonable classification becomes unnecessary. Such consideration is purely political and not judicial. We have frequently decided that the Court is not concerned with the wisdom of legislation, but merely its legality.

As to the question of *local* laws: the Legislature may constitutionally adopt local laws governing the population of *Philadelphia*. This conclusion is buttressed by even a casual reading of the Consolidation Constitutional Amendment. The Constitutional *Amendment* itself singles out the *City of Philadelphia*. Such amendment does not refer to a city of any particular class. Consequently, any act of the Legislature passed *in accordance with the power conferred by the Constitutional Amendment* may, therefore, specifically refer to the City of Philadelphia. To decide that, since the Act of 1953, supra, singles out the *City of Philadelphia* and is not expressed in terms of a city of a certain class, it is unconstitutional has the effect of declaring unconstitutional a constitutional amendment.

I, therefore, dissent and would affirm both judgments of the court below.

DISSENTING OPINION BY MR. JUSTICE BELL:

I protest this decision. I protest the decision (1) because it is constitutionally unsound, and (2) because the Court is unfair to the people of Philadelphia when it fails to decide the vital and tremendously important public questions which are *specifically raised* in the Petition for a declaratory judgment in this case. I shall discuss these in their inverse order.

Philadelphia is agitated more than it ever has been in the last 50 years. Is the City Charter, which was won after a quarter of a century fight, to be preserved inviolate for a period of five years, or can it be amended, and if so, to what extent, how and by whom? More particularly, can the "No Politics" ban and the Civil Service provisions be eliminated by the legislature in some city departments and not in others, and if so, how? The Mayor of Philadelphia, the City Solicitor and leading officials of the City, the Attorney General of Pennsylvania and counsel representing all parties having a direct and indirect interest agree on the basic issues; they agree that the most important issue is whether the legislature having granted certain Home Rule powers to the City can alter, change or revoke any of the powers granted. Yet these basic questions or issues are unanswered by the Court's Opinion—on the contrary the Opinion by its implications beclouds instead of answers them.

What does the Court's failure to decide the basic questions involved mean to the people of Philadelphia, and what are the disastrous results which will likely flow from the Court's Opinion?

The legislature has eliminated the "No Politics" ban and the Civil Service provisions in some City departments; city council is in a turmoil trying to decide what it may and should do to amend these and other provisions of the Charter; figuratively speaking, the

168

people of Philadelphia are up in arms over the issues *herein specifically* raised. The majority opinion, while refusing to pass upon the great fundamental issues involved, has pinpointed its decision on one of the tiny issues involved, but with this regrettable result—that if its opinion is carried to its logical conclusion it will be constitutionally *impossible for either the legislature or the People* to establish civil service provisions or political activities for employees after working hours in some departments but limit or prohibit them in other departments. The majority do not specifically so decide, but that is the logical and implied result of its opinion. Any decision which holds even impliedly that *the American people* cannot by their vote allow office holders, stenographers, clerks or employees in some departments of the City the right to engage in political activities after working hours, or the right of an office head to discharge an employee is in my judgment so unreasonable and so un-American as to be absolutely unjustifiable.

The net result of the majority's failure or refusal to decide the basic questions which are involved and were so ably argued in this case will be this:

Both political organizations, the people throughout the entire City, the newspapers and city council will spend weeks and months, interspersed with bitter charges and counter-charges debating the basic issues here involved and here undecided; committees, partisan and bi-partisan, will be formed to determine what amendments may be and should be enacted by the legislature or by council, or what amendments may be and should be submitted to the people for their vote; and, of course, how they should be worded, and when the vote should take place. Enormous sums of money will be spent and a colossal amount of work will be done to support or defeat this or that proposed amendment.

The people will finally vote to adopt or reject each of the proposed amendments. Then what will happen? Whatever is passed or adopted is certain to be appealed by some interested party to this Court. If, for example, the people vote to retain the "No Politics" ban, or the Civil Service provisions in certain departments and not in others, the constitutionality of this amendment will undoubtedly be appealed to this Court, and the majority, unless one or more, upon more careful analysis or further study, changes his opinion, will declare it to be unconstitutional and void as special or local legislation which has no reasonable basis or classification.

But even if a majority of this Court by any chance would approve a new legislative act or a new ordinance, or a new amendment voted by the people of Philadelphia, irrespective of what changes or amendments were embodied therein, that would not conclude the matter. The constitutionality of the new act or ordinance or amendment will thereafter be immediately challenged on still another ground which has been *specifically raised* in the instant case by the very able counsel for the Greater Philadelphia Movement. This additional constitutional objection, which the majority fail or refuse to now pass upon, is based upon §16 of Article I of the First Class City Home Rule Act of 1949, which provides: "No proposal of a new charter or amendments of similar substance, purpose and intent shall be submitted to the qualified electors oftener than once in every five years." Although this does not mention any Act of the legislature, counsel contends, in brief, that since the City Charter was adopted on April 17, 1951, effective January 7, 1952, amendments to the Charter can be made only by their submission by city council to the people of Philadelphia; and the people of Philadelphia cannot vote to amend their Charter until

after it has been in existence for five years; and thereafter no similar amendment can be voted upon by the qualified electors until another period of five years has elapsed. While I disagree with this ingenious construction, the issue is specifically raised in the instant case and it is of such tremendous public importance that it should be decided now by this. Court, for if counsel's contention is correct *any* amendment which the people would adopt prior to 1957 would be unconstitutional and void. All of the aforesaid enormous efforts of civic minded citizens, all of the large expenditure of money, all of the ill will and bitterness which inevitably will be generated, can, should be, and would be avoided if this Court decided, as it should, all of the vitally important public issues which have been presented in this case.

We shall now discuss in greater detail the constitutionality of the challenged Act of 1953 and particularly of §5 thereof.

The petition for a declaratory judgment in this case involved the meaning, validity and constitutionality of §5 of Act No. 433, approved August 26, *1953,* and of all the important constitutional questions arising thereout.

The Act authorizes the council of the City of Philadelphia to legislate with respect to the election, appointment, compensation, organization, abolition, merger, consolidation, powers, functions and duties of the coroner, recorder of deeds, city treasurer, clerk of the court of quarter sessions, oyer and terminer and general jail delivery, and a board of inspectors of the Philadelphia county prison. It then provides for the election of a district attorney; and for a continuation of the functions theretofore granted by the General Assembly. In view of the fact that leading officials of the City attempted to persuade the legislature to enact all of this Act except §5, and that city council has abol-

ished, merged and reorganized certain offices and has operated and legislated pursuant to the authority granted by the Act, it is astonishing to hear these same persons deny the right of the legislature to pass any law dealing with the organization of or regulating the affairs of the City of Philadelphia.

The Act in §5 removes four named City offices from the operation of certain provisions of Philadelphia's so-called Home Rule Charter. The language and meaning of the Act are clear. We confine this opinion to a discussion of those important constitutional questions involved, which have any merit.

"When the constitutionality of an Act of Assembly is questioned, a Court can declare the act void only when it clearly and plainly violates the constitution: Evans v. West Norriton Township, 370 Pa. 150, 87 A. 2d 474; Tranter v. Allegheny County Authority, 316 Pa. 65, 173 A. 289." *Allentown Sch. Dist. Mer. Tax Case,* 370 Pa. 161, 166, 87 A. 2d 480. See to the same effect *Com. v. Cochran Post,* 350 Pa. 111, 112, 38 A. 2d 250; 1 Cooley's Constitutional Limitations, (8th Ed.) 371; *Busser v. Snyder,* 282 Pa. 440, 128 A. 80; *Pennsylvania Railroad v. Riblet,* 66 Pa. 164; *Loomis v. Board of Education,* 376 Pa. 428, 103 A. 2d 769.

". . . Where the meaning of an act is doubtful, and two constructions are reasonably possible, one of which will render the act constitutional and the other unconstitutional, the courts should adopt a construction which renders the statute constitutional: Fidelity-Philadelphia Trust Co. v. Hines, 337 Pa. 48, 10 A. 2d 553; Carr v. Aetna A. & L. Co., 263 Pa. 87, 106 A. 107 . . .": *Evans v. W. Norriton Twp. Mun. Auth.,* 370 Pa. 150, 158, 87 A. 2d 474.

The power to legislate for cities is, under Article II, Section 1 of the Constitution of Pennsylvania, in the legislature. Under the law of Pennsylvania, cities

172

and municipalities are not sovereigns; they have no original or fundamental power of legislation; they have the right and power to enact only those ordinances which are authorized by an act of the legislature and are in conformity with the provisions of the enabling statutes: *Genkinger v. New Castle,* 368 Pa. 547, 549, 84 A. 2d 303; *Kline v. Harrisburg,* 362 Pa. 438, 68 A. 2d 182; *Murray v. Phila.,* 364 Pa. 157, 71 A. 2d 280; *Phila. v. Fox,* 64 Pa. 169, 180; *Com. v. Moir,* 199 Pa. 534, 541, 49 A. 351; *Trenton v. New Jersey,* 262 U. S. 182; *Hunter v. Pittsburgh,* 207 U. S. 161; *Pittsburg's Petition,* 217 Pa. 227, 66 A. 348. Moreover, it has been held by the Supreme Court of the United States and by the Supreme Court of Pennsylvania, speaking through two of the greatest Judges this Court has ever had, Chief Justice SHARSWOOD and Chief Justice MITCHELL, and by the Superior Court as recently as 1945 in *Iben v. Monaca Borough,* 158 Pa. Superior Ct. 46, 43 A. 2d 425, that *a legislature may change, modify or destroy a City's Charter at will.* In *Phila. v. Fox,* 64 Pa., supra, Justice SHARSWOOD said (page 180): "The City of Philadelphia is beyond all question a municipal corporation, that is, a public corporation created by the government for political purposes, and having subordinate and local powers of legislation: 2 Kent's Com. 275; an incorporation of persons, inhabitants of a particular place, or connected with a particular district, enabling them to conduct its local civil government: Glover Mun. Corp. 1. It is *merely an agency instituted by the sovereign for the purpose of carrying out in detail the objects of government—essentially a revocable agency—having no vested right to any of its powers or franchises—the charter or act of erection being in no sense a contract with the state—and therefore fully subject to the control of the legislature,*[*] who

---

[*] Italics throughout, ours.

may enlarge or diminish its territorial extent or its functions, *may change or modify its internal arrangement, or destroy its very existence,* with the mere breath of arbitrary discretion. . . ."

In *Com. v. Moir,* 199 Pa., supra (decided in 1901), Justice MITCHELL said (page 541) : "Municipal corporations are agents of the state, invested with certain subordinate governmental functions for reasons of convenience and public policy. *They are created, governed, and the extent of their powers determined by the legislature, and subject to change, repeal, or total abolition at its will. They have no vested rights in their offices, their charters,* their corporate powers, or even their corporate existence. This is the universal rule of constitutional law, and in no state has it been more clearly expressed and more uniformly applied than in Pennsylvania. . . . ."

This basic right of the legislature of Pennsylvania to control, modify, repeal or destroy the Charter as well as the very existence of a City has been so clearly and unequivocally stated by our Court and by the Supreme Court of the United States that we wonder that it is now questioned, doubted and denied. However, we do not have to place our decision on these majestic authorities because both the enabling legislative acts and the constitutional amendment under which the City of Philadelphia derives all its claimed or challenged powers, clearly limits those powers to the will of the legislature and the mandate of the Constitution.

Philadelphia's Home Rule Charter of *1951* was adopted pursuant to the following acts and constitutional amendments, without which, as we have seen, Philadelphia would have none of the legislative powers claimed herein. The Genesis of Philadelphia's legislative power was the so-called Home Rule Amendment, Article XV, §1 of the Constitution of Pennsylvania,

174

adopted November 7, *1922.* The material provisions of this Amendment are as follows: "Cities *may* be chartered . . . Cities, or cities of any particular class, *may* be given the right and power to frame and adopt their own charters and to exercise the powers and authority of local self-government, *subject, however, to such restrictions, limitations, and regulations, as may be imposed by the Legislature."* That enabling amendment is so clear as to need no exposition. It gives no absolute or inherent right to a city to frame a charter or even to exercise powers of local self-government. It gives to the legislature a right, in its sole discretion, to grant to a city the powers of local self-government *subject to whatever restrictions and limitations may be imposed by the legislature.* Nothing was done or accomplished under this constitutional amendment until the legislature, by Act of April 21, *1949,* P. L. 665, passed the enabling First Class City Home Rule Act, which granted such cities the right to have a new charter or amendments, but again (in Section 11)* subject to the limitations, restrictions and regulations hereinafter prescribed. Section 17** of the First Class City Home Rule Act provides: *"Subject to the limitations hereinafter prescribed,* the city . . . may exercise all powers and authority of local self-government . . .".* Thereafter and pursuant thereto, the electorate of Philadelphia on April 17, 1951, adopted a Home Rule Charter effective on January 7, 1952. This Charter was a voluminous, detailed framework of government, with minute directions and details for every office created or mentioned and the powers and duties of the officers thereunder. It provided, inter alia, that men and women employees in so-called County departments of Philadelphia (which were co-extensive territorially and

* 53 P.S., Section 3421.11.
** 53 P.S., Section 3421.17.

geographically with the City of Philadelphia) who had always enjoyed the American privileges and immunities of engaging in political activities after working hours, should thereafter become and be called City employees but no longer possess such privileges and immunities and should be under civil service.

The present City Charter is a magnificent magnum opus, but were its designers and drafters possessed of the Biblical wisdom of Solomon they could not possibly have clearly and beyond question epitomized and incorporated into this document the provisions of countless thousands of pages of laws which had been enacted during a period of 200 years pertaining to the City and the County of Philadelphia. This monumental document will necessarily be the subject of interpretation, we venture to predict, for at least 50 years, and we only hope that the important civic questions arising therefrom will be approached by all parties concerned in a judicial manner and not with the emotionalism and turmoil which have made the important issues in this case a political football.

We come now to the *City-County Consolidation Amendment*, §8, Article XIV of the Constitution, which was adopted by the people of Pennsylvania on November 6, *1951*—6 months after the City Charter was adopted and 2 months before it went into effect. Its main purpose was to eliminate the dual County and City sovereignty that existed in the same territorial area known as Philadelphia, to consolidate their governmental functions, and to enable the people of Philadelphia to frame and adopt their Charter and to legislate as to local affairs *"until the General Assembly shall otherwise provide."* This limitation is in accord, as we have seen, (a) with other provisions of the Constitution, and (b) particularly with the Home Rule Constitutional Amendment of 1922, and (c) with the

First Class City Home Rule Act of 1949, and (d) with all the prior decisions of the Supreme Court of Pennsylvania; and this is the controlling language which is ignored by the City and by the majority opinion in this case.*

The City-County Consolidation Amendment of 1951 is short and provides as follows: "(1) In Philadelphia all county offices are hereby abolished, and the city shall henceforth perform all functions of county government within its area through officers selected in such manner *as may be* provided by *law*. [Law unquestionably means legislative acts.]

"(2) *Local and special laws,* [meaning, unquestionably, legislative acts] *regulating the affairs of the city of Philadelphia and creating offices or prescribing the powers and duties of officers of the city of Philadelphia, shall be valid* notwithstanding the provisions of section seven of article three of this Constitution.

"(3) All laws [meaning, unquestionably, legislative acts] applicable to the county of Philadelphia shall apply to the city of Philadelphia.

. . .

"(5) The provisions of article fifteen, section one of the Constitution shall apply with full force and effect to the functions of the county government hereafter to be performed by the city government.

---

* The wisdom or folly of permitting the legislature to regulate or alter the powers of local self-government given to the City of Philadelphia is not within the province of this Court. It may not be amiss to point out to those who are fearful of the legislative power, that anyone who has read the newspapers for the several months that the Act here involved was being debated, will know how difficult it is for the legislature to pass any act which importantly affects and changes, *over local objection*, the administration of local affairs in Philadelphia.

"(6) This amendment shall become effective immediately upon its adoption.

"(7) Upon adoption of this amendment all county officers shall become officers of the city of Philadelphia, and, *until the General Assembly shall otherwise provide*, shall continue to perform their duties and be elected, appointed, compensated *and organized* in such manner as may be provided by the provisions of this Constitution and the laws of the Commonwealth [meaning unquestionably legislative acts] in effect at the time this amendment becomes effective, but such officers serving when this amendment becomes effective shall be permitted to complete their terms."

The City-County Consolidation Amendment specifically recognized and reaffirmed the supreme power of the legislature in and over the City of Philadelphia. Moreover, the City-County Consolidation Amendment also expressly provided that Article XV, §1 of the Constitution should (continue to) apply with full force and effect. Article XV provided, it will be recalled, that cities may be chartered, *subject, however, to such restrictions, limitations and regulations as may be imposed by the legislature.* It is important to note that the legislature has never been deprived of this power, nor has it ever abandoned or relinquished its power.

In the light of all of these Constitutional provisions and statutes which specifically preserved to the legislature the right to enact laws for cities, and to impose such restrictions, limitations and regulations as the legislature desired, and to enact local and special laws regulating the affairs of the City of Philadelphia, how can there be any possible merit to the contention that the legislature no longer has such powers.*

---

* It is interesting to note that while the question was not specifically decided, Mr. Chief Justice STERN, speaking for the Court, said in *Lennox v. Clark*, 372 Pa. 355, 370, 93 A. 2d 834; "Since

The majority place their decision on the ground that this Act is local and special legislation which is unconstitutional (1) because it applies only to the City of Philadelphia, (2) because it changes the City Charter, and (3) because it grants *special* privileges and immunities arbitrarily to the employees of some departments.

1. Notwithstanding any contrary implication in the majority opinion, if this Act of 1953 applied to *all cities of the first class* it would seem clear that the Act could not be invalidated on the ground that it was local legislation which was prohibited by Article III, §7 of the Constitution: Article III, §34 of the Constitution: *Haverford Township v. Siegle,* 346 Pa. 1, 28 A. 2d 786. Entirely apart from that, since Philadelphia has adopted under legislative permission a special City Charter *applicable only to it,* it is difficult if not impossible to perceive how the affairs of the City could be regulated by the legislature without expressly and specifically referring to the City of Philadelphia.

Moreover, §5 of this Act of 1953 cannot be voided as local legislation on the ground adopted by the majority, namely, "because it relates in terms to the City of Philadelphia only", *unless the entire Act is likewise so voided,* since it enables, not "a city of the first class", but *City Council of the City of Philadelphia* to legislate, organize and reorganize, merge or abolish five municipal offices; and City Council and the Mayor have

---

clause (7) of the City-County Consolidation Amendment provides that the county officers are to continue, now as city officers, to perform their duties 'until the General Assembly shall otherwise provide,' it would seem that any proposed reorganizations, regroupings, abolitions, or mergers, of the former county offices, designed the more advantageously to incorporate their functions into the existing municipal structure, must wait upon action by the General Assembly."

organized and reorganized, merged or abolished the of-
fices and departments of the City of Philadelphia under
the terms and by virtue of this very Act of 1953; and
also because the Act alters the term of the District
Attorney *of Philadelphia.* Furthermore, and as a com-
plete and crushing answer to the majority's position,
the City-County Consolidation Constitutional Amend-
ment specifically says that *"local and special laws regu-
lating the affairs of the City of Philadelphia . . . shall
be valid"* notwithstanding the prohibition thereof con-
tained in Article III, §7 of the Constitution. To sum-
marize: The majority's position that §5 thereof is local
legislation for the reason that it refers and applies
only to the City of Philadelphia is obviously utterly
untenable.

2. *Changing the Charter.* The majority hold that
a special law which regulates the affairs of the City of
Philadelphia, or creates offices or prescribes the powers
and duties of officers in said City, might be valid and
constitutional, *but not if* (as here) *it changes the
Charter of the City.* The City-County Consolidation
Constitutional Amendment does not so provide. What
does it provide?

The City-County Consolidation Amendment of 1951
provided, inter alia: "(2) Local and special laws,
[meaning unquestionably legislative acts] regulating
the affairs of the city of Philadelphia and creating
offices or prescribing the powers and duties of officers
of the city of Philadelphia, shall be valid notwithstand-
ing the provisions of section seven of article three of
this Constitution."

The basis of the majority opinion is the "notwith-
standing" clause. There are three possible interpreta-
tions of this "notwithstanding" clause.

Article III, §7 of the Constitution prohibits 28
different subjects including any local or special law

"Incorporating cities, towns or villages or changing their charters: . . . Creating offices, or prescribing the powers and duties of officers in counties, cities, boroughs, townships, election or school districts." The City-County Consolidation Amendment of 1951 naturally did not attempt to exclude by enumeration or name all of the 28 prohibitions of Section 7 of Article III; it did not say that local or special laws regulating the affairs of the City shall be valid "notwithstanding *some* of the 28 provisions of Section Seven of Article Three"; it said "local and special laws regulating the affairs of the City of Philadelphia . . . shall be valid notwithstanding *the provisions* of Section Seven of Article Three of this Constitution." A literal interpretation of this language would mean, as the Attorney General contends, that none of the provisions or prohibitions contained in Article III, §7 now apply to the City of Philadelphia. But I believe that a careful analysis of the reasons for the Amendment, the history of this constitutional development and a consideration of the entire Amendment show that that is not the true meaning of this paragraph or clause. I believe it means this—local and special laws regulating the *governmental* affairs of the City of Philadelphia and creating offices or prescribing the powers and duties of officers of the City shall be valid notwithstanding the prohibitions thereof contained in Article. III, §7.

Certainly it is clear, as Mr. Justice STEARNE holds, that all provisions of Article III which are inconsistent with later constitutional amendments are repealed by implication and the later amendment must prevail. The majority hold that 26 of the 28 prohibitions contained in Article III, §7 of the Constitution are still applicable to Philadelphia because they were not *specifically* excluded from the grant of power contained in the City-County Consolidation Amendment; and that

2 of the 26 prohibitions apply in this case and render the Act of 1953 unconstitutional. The Amendment is not as clear on this point as it should be. However, whether 26 of the prohibitions contained in Article III, §7 still apply, or whether none applies, or whether only those apply which are not inconsistent with the City-County Consolidation Amendment, is in my judgment, immaterial at this time, because none of the 26 are applicable to this challenged Act of 1953.

The reason why Article III, §7 of the Constitution of 1874 prohibited a local or special law incorporating cities or changing their charters, and the City-County Consolidation Amendment did not contain such a specific prohibition is clear. In 1874 when the Constitution was adopted, the legislature, and only the legislature, could grant or change a charter. It was therefore both wise and necessary at that time to restrict the right of the legislature by expressly prohibiting it from enacting *local or special* laws to incorporate a city or change its charter. The Commonwealth argues that this reason and necessity ceased in *1922* when the Home Rule Constitutional Amendment, to wit, Article XV, §1, empowered the legislature in its discretion to grant to cities "the right and power to frame and adopt their own charters and to exercise the powers and authority of local self-government, subject, however, to such restrictions, limitations, and regulations, as may be imposed by the Legislature." If thereafter a charter and certain ordinances were adopted by one city council they would almost inevitably differ in some important particulars from those adopted by other city councils; and legislative acts imposing restrictions and regulations would necessarily deal differently with different charters and different provisions of local self-government; and consequently the prohibition in the 1874 Constitution against local or special laws changing charters

was impliedly repealed. Whatever doubts may exist as to this contention, when the Home Rule Amendment of 1922 is considered together with the First Class City Home Rule Act of 1949 *and especially with the City-County Consolidation Amendment of 1951* (which authorized the legislature to pass local and special laws to regulate the governmental affairs of the City of Philadelphia, to create offices for the City, and to prescribe the powers and duties of officers of the City, in spite of the prohibition thereof in Article III, §7 of the 1874 Constitution) all doubts are completely removed, because these Constitutional Amendments and the First Class City Home Rule Act *taken together* are *absolutely inconsistent* with and necessarily repeal the 1874 prohibition of changing a charter by local or special legislation. This becomes clear as crystal when the Charter of the City of Philadelphia is examined.

The Philadelphia City Charter is 100 pages in length. It is encyclopedic in scope and in detail. It creates offices and minutely describes and defines the powers and duties of every officer of the City of Philadelphia; and in every page it minutely and with very great detail regulates the affairs of the City of Philadelphia. That is exactly what it does and all it does. How, then, we may appropriately ask, is it possible to regulate the affairs of the City of Philadelphia, or to create offices, or to prescribe the powers and duties of officers of the City *without changing the Charter? That question is unanswered by the majority opinion.*

The reason for the language of the City-County Consolidation Amendment seems to us obvious. When this constitutional amendment provided that all local and special laws *regulating the affairs of the City of Philadelphia* should be valid, some persons might have had reasonable grounds for doubting whether that broad, general power was sufficient to enable the legis-

lature to create offices or to prescribe the powers and duties of officers of the City. In other words, people might reasonably differ as to whether the power "to regulate the affairs" included also the power to "create offices", and it was to remove any reasonable doubt on that subject that language granting to the legislature such powers was expressly inserted in the City-County Consolidation Amendment.

It was totally unnecessary to expressly authorize, in and by the City-County Consolidation Amendment, the legislature to change Philadelphia's Charter since (a) the legislature had the constitutional power, as we have seen, to prescribe the conditions and limitations under which a city could frame a charter; (b) the legislature could, under the prior decisions of this Court, alter or revoke any charter at will; and (c) the encylopedic Philadelphia Charter had been adopted six months before the City-County Consolidation Amendment and the people of Pennsylvania, in adopting this constitutional amendment giving the legislature the right to pass local and special laws regulating the affairs of the City of Philadelphia, knew that it was virtually impossible to regulate the affairs of the city without automatically and inevitably changing the massive, detailed Charter.

Moreover, the Constitutional Amendment of 1951—which of course is supreme over the Charter and over the Home Rule Act of 1949, and over any prior provision of the Constitution, if any, which is inconsistent therewith—does not limit the legislature to the innocuous position of only being able to pass legislation to permit city council to frame and pass an ordinance pursuant thereto; nor does its language limit it merely to regulating the affairs, and then only to a very limited extent, of former county offices and former county officers, as the majority, in effect, hold. This is con-

trary to the clear and specific language of the Amendment, which grants, not to city council or to the people of Philadelphia, but *to the legislature* (a) the right to pass local and special laws regulating the [governmental] affairs of the *City* of Philadelphia, creating *city* offices and prescribing the powers and duties of *city* officers (Sec. 2); and (b) the right to enact laws to provide for the election, appointment, compensation and organization of former *County* officers (Sec. 7). The language of the Amendment is so plain and so clearly contrary to these contentions that the Amendment cannot be thus rewritten.

To summarize: The majority's position that the legislature can pass local and special laws regulating the affairs of the City of Philadelphia provided they do not change the City's Charter, is, in my judgment, so unreasonable, impractical and illogical as to be utterly unsupportable. Section 52 of the Statutory Construction Act of 1937 provides a presumption that the legislature does not intend a result that is unreasonable or impossible of execution or absurd. With due deference, I am convinced that the majority's construction of the meaning of the Amendment on this particular point of prohibiting a change in the Charter is so unreasonable as to be absurd.

It has been contended that other sections of the 1953 Act regulate the affairs of the City of Philadelphia without changing its charter. An analysis will show how specious that contention really is. Section 1 of the Act of 1953 is a mere declaration of legislative purposes. Sections 2 and 4 of the Act of 1953 do not regulate the affairs of the City of Philadelphia, as the City contends; Section 2 merely contains enabling provisions authorizing City Council to legislate with respect to the five offices therein mentioned, and §4 merely confirms prior legislative acts and provides for

a continuation of functions. Section 3 provides for the election of a district attorney in accordance with the express authority which was specifically granted to the legislature in §7 of the City-County Consolidation Amendment. The City's contention or construction which has been adopted in the concurring Opinion gives to the Constitutional Amendment of 1951 which authorizes the legislature to pass laws regulating the affairs of the City of Philadelphia *such a restricted meaning as to make Section 2 of the City-County Consolidation Amendment in effect absolutely meaningless.*

The City's contention that the legislature, if its power were unrestricted by 26 prohibitions in Article III, §7 could pass local and special laws granting divorces, changing the laws of descent, changing the rules of evidence, or fixing the rates of interest, is likewise without merit. This obviously would not be "regulating the [governmental] affairs of the city or creating offices or prescribing the powers and duties of officers of the city" which was the authority specifically granted to the legislature by the City-County Consolidation Amendment. Philadelphia is still an integral part of the Commonwealth of Pennsylvania and the people of Pennsylvania, when they adopted the City-County Consolidation Amendment of 1951, never said or intended that Philadelphia could be insulated, divorced and separated from the State so as to permit local and special laws for Philadelphia with reference to statewide matters of divorce, descent, interest rates, rules of evidence and other similar subjects of statewide importance. The Amendment, I repeat, authorized the legislature to pass local and special laws regulating the governmental affairs of the City of Philadelphia.

3. *Special or exclusive privilege or immunity.* Article III, §7 prohibits the passage of any local or special law "granting to any corporation, association or in-

dividual any *special* or exclusive privilege or immunity, or to any corporation, association or individual the right to lay down a railroad track."

The main ground on which the majority seem to pinpoint their opinion is the latter part of §5 of the Act of 1953, which asserts that the provisions in the Philadelphia Home Rule Charter relating to civil service and prohibiting political activities by officers and employees of the City of Philadelphia shall be inapplicable to the sheriff, the city commissioners, the board of revision of taxes, and the registration commission, and to their employees. The majority hold this is unconstitutional because it is a local and special law which grants to certain individuals—I assume the officers and employees in the 4 offices mentioned—*a special or exclusive privilege or immunity*.

There are several answers to this contention, each of them controlling. The first one is that the Supreme Court of Pennsylvania has decided that *the right to engage in political activities* after work hours *is not a special or exclusive privilege or immunity within the meaning of the Constitution.* The legislature may prescribe reasonable conditions or regulations for public employment and may prohibit political activity of office holders without abridging their constitutional rights: See *Duffy v. Cooke*, 239 Pa. 427, 86 A. 1076; *McCrory v. Philadelphia*, 345 Pa. 154, 27 A. 2d 55. The converse must likewise be true—the legislature may permit political activity of office holders without abridging their constitutional rights, for if it is not a *"special* exclusive privilege"* within the meaning of Article III, §7 of the Constitution to engage in political activities, how can the legislative permission to engage in such activities grant those persons a *"special* and exclusive privilege or immunity"? The answer is logical and obvious—it can't. The reason is not difficult to dis-

cover. The right to hire and fire without a merit system, and the right to engage in political activities after working hours is not "a *special* or exclusive privilege" *for a few privileged* Americans; it is a universal right or privilege which, until a few years ago, had been enjoyed by all the American people and by private and public business since the birth of our Country.

The issue presented in this case is *not* whether the civil service system is desirable or undesirable or whether the ban on political activities is desirable or undesirable,* but only whether the legislature has constitutionally the right and the power to apply civil service and to ban political activities to some employees in some city offices. This is a matter for the discretion of the legislature, not of the Courts. A very wide discretion must, under our cases, be vested in the legislature; the act of the legislature must be held constitutional unless clearly and plainly unconstitutional and the classification must be sustained by the Courts

---

* To those who sincerely believe that political activities are anathema and civil service is the answer to every problem of good government, may we say that most people who believe in good government and who have had actual experience with both civil service and political activities, agree that each possesses merits and demerits, advantages and drawbacks, and that each, but particularly political activities, is bad when carried to an extreme. When one studies the history of our Country and the record of fine government in the rural counties of Pennsylvania which never had civil service, one cannot help wondering how our Country grew to be the greatest Country in the world without civil service; and what our Country would be like today if engaging in political activities had been considered *a special or exclusive privilege*, and Jefferson, Hamilton, Madison, Franklin, Jay, Lincoln, Theodore Roosevelt and Franklin D. Roosevelt had been prohibited from exercising one of the greatest privileges enjoyed by any freedom-loving nation.

unless there can be found no reasonable ground for such classification.

This case was presented on agreed facts without any testimony. There is absolutely nothing in the record of this case which justifies the *assumption* by the majority that the employees of the 4 offices who were permitted to engage in political activities after work hours are performing precisely the same type of work and receiving the same pay as workers in other city offices. It is obvious that assessors of real property and the appraisers of personal property can be found and classified in no other department than in the board of revision of taxes and that they do not perform exactly or precisely the same work as do clerks and employees in the mayor's department, or coroner's department, or in the city treasurer's department, or the clerk of court's department, or in the board of inspectors of the Philadelphia County Prison. The same observation is likewise applicable to the sheriff's deputies.

Reasonable provisions for civil service have been sustained as Constitutional by this Court. In *Haverford Township et al. v. Siegle et al.*, 346 Pa. 1, 28 A. 2d 786, the Act of June 5, 1941, P. L. 84, provided for civil service for policemen in such municipalities *as have three or more paid police officers*. The Court said (page 9) : "Finally, it is argued that the Act violates the twenty-sixth clause of section 7, Article III, prohibiting local or special laws granting to any corporation or individual any special privilege or immunity. It is said that the statute grants privileges to members of the police force in first class townships having a police force of more than three members, and denies them to policemen in other such townships. The obvious answer is that such differences always happen whenever legislation regulating municipal affairs is made effective in certain municipalities and not in

others. If such an argument were sound, civil service could never have been inaugurated unless it were done in every city, town, borough and township in the Commonwealth at the same time. The patent unreasonableness of such a suggestion destroys it."

The *Haverford Township* case holds that a grant of the privilege of civil service to policemen in towns having a 3-man police force and the exclusion therefrom or the denial thereof to policemen in towns having a 2-man police force is a "reasonable classification" and therefore constitutional. If that classification, where the policemen in the 3 police town and in the 2 police town do exactly the same work and have exactly the same powers and duties, and presumably receive the same pay, is constitutional, how can it be held that the classification in the instant case, where assessors and appraisers and other employees in one or more offices have work and duties manifestly different from employees in other city offices, is plainly arbitrary and clearly unjustifiable. The *Haverford Township* case directly or in principle controls the instant case and destroys the City's contentions and the majority's position on this issue.

In *Iben v. Monaca Borough,* 158 Pa. Superior Ct., supra, the Court sustained the Constitutionality of the Act of May 14, 1937, P. L. 632, 53 PS 327, which granted to any policeman or fireman of a borough who was injured in the performance of his duties, his full salary for the period during which he was disabled (less workmen's compensation payments received), even though the Act was limited in its benefits to two classes of employees and did not apply to all municipal employees generally. The Court held that the Act did not violate Article III, section 7 of the Constitution. This decision once again demonstrates that even where money payments are provided under an Act, the legis-

lature may validly and reasonably separate employees of certain municipal departments from others and grant them special benefits and privileges, and at the same time exclude employees of other municipal departments therefrom.

This proposition of *special* or exclusive privilege on which the majority peg their opinion was considered by the able counsel who argued this case to be so totally inapplicable that it was neither argued nor briefed in the lower Court and except for the city solicitor, none of the many counsel for all of the parties involved discussed or even mentioned the subject in their lengthy and well considered briefs in this Court; nor was it considered to be even worth mentioning by Judge MILNER in his exhaustive, scholarly and learned opinion for the Court below.

The majority and the City Solicitor cited two cases of this Court and one of the Superior Court to support their position. These cases instead of supporting that position are so inapposite and so far-fetched as to demonstrate the utter untenability of the majority's position. Those cases, and many other cases which we shall cite, do, however, aptly illustrate what is meant by the words "special privilege and immunity"; and further demonstrate that this clause has never heretofore by the remotest stretch of the imagination been applied as the majority now apply it.

The first case cited by the majority is *Com. ex rel. Graham v. Schmid,* 333 Pa. 568, 3 A. 2d 701. In that case this Court held unconstitutional a provision of a third class city law which permitted veterans a lower passing grade in civil service examinations than other candidates, and granted them a 15% credit, not merely as a preference, but as an aid in establishing eligibility. This was held to create a special privilege.

The second case cited is *Carney v. Lowe,* 336 Pa.

289, 9 A. 2d 418. The Court held invalid a provision of a third class city law which permitted the appointment of war veterans to civil service positions without regard to any age limitations, prescribed under the General Civil Service Regulations. This Act likewise gave veterans a special privilege.

In *Wood v. Philadelphia*, 46 Pa. Superior Ct. 573, the Superior Court held unconstitutional a statute which exempted veterans from taking the examination for a civil service position. This obviously gave veterans a special privilege.

Those are the only decisions of this Court or of the Superior Court which the majority cite to sustain their position that this was local and special legislation which granted special and exclusive privileges to employees of four City departments. To these cases we add: *Com. ex rel. Maurer v. O'Neill*, 368 Pa. 369, 83 A. 2d 382, and *Kurtz v. Pittsburgh et al.*, 346 Pa. 362, 31 A. 2d 257. In the *O'Neill* case the Court held an act to be unconstitutional which gave a preference to veterans over non-veterans for *promotion* to higher public positions.

In the *Kurtz* case this Court declared unconstitutional an act which gave to dependent wives and children of State employees in the armed services part of such employees' pay.

These cases are so different from the instant case, and the analogy is so farfetched as to furnish no possible support for the majority's opinion. In this connection and as further illustration of what is meant by "privileges and immunities", we call attention to *Loomis v. Board of Education*, 376 Pa. 428, 103 A. 2d 769, and *Turco Paint & Varnish Co. v. Kalodner*, 320 Pa. 421, 184 A. 37.

Loomis was a school teacher employed by the State. He was also a lieutenant colonel in the Reserves. He

requested a military leave of absence for 15 days without loss of salary in accordance with the Act of July 12, 1935, which clearly granted him such right. The Commonwealth contended that the Act was unconstitutional because it violated Article III, §7 of the Constitution as a special law granting to individuals "a special or exclusive privilege and immunity." We sustained, in a unanimous opinion, the constitutionality of that Act and rejected the contention that the Act granted to individuals "a special or exclusive privilege." In other words, we held that it was constitutional to grant a person in the Reserves his full salary (not only during periods such as illness and vacation, but also) for the period of 15 days in each year in which he was engaged in army training or maneuvers. The Court there said: "Nothing but a clear violation of the Constitution will justify the judiciary in nullifying a legislative enactment. Every presumption must be indulged in its favor, and one who claims an Act is unconstitutional has a very heavy burden of proof: Tranter v. Allegheny County Authority et al., 316 Pa. 65, 173 A. 289; Busser et al. v. Snyder et al., 282 Pa. 440, 128 A. 80; The Pennsylvania Railroad Co. v. Riblet, 66 Pa. 164. When a statute is challenged as prohibited special legislation, the reasonableness of the classification made is for the Legislature in the first instance; the duty of the court is limited to considering whether the Legislature had any reasonable ground for making it: Chester County Institution District et al. v. Commonwealth et al., 341 Pa. 49, 17 A. 2d 212; National Transit Company et al. v. Boardman, Secretary of Revenue, 328 Pa. 450, 197 A. 239 . . . Courts may not question the wisdom of the legislative classification unless there can be found no reasonable ground for it. '. . . The test is, not wisdom, but good faith in the classification.': J. A. Seabolt et al. v. The Commis-

sioners of Northumberland County, 187 Pa. 318 41 A. 22."

In *Turco Paint & Varnish Co. v. Kalodner*, 320 Pa., supra, the Court sustained the Corporate Net Income Tax Act as well as the *exclusion therefrom of building and loan associations, banks, trust companies, insurance companies, and the like.* It said (pages 432-433) : ". . . 'Classification cannot be made arbitrarily. . . . It must always rest upon some difference which bears a reasonable and just relation to the act in respect to which the classification is proposed, and can never be made arbitrarily and without any such basis. . . . Nor may any question be raised concerning the right of the Commonwealth to classify properties and their owners for the purpose of taxation': Schoyer v. Comet Oil & Refining Co., 284 Pa. 189, 197.

"Mr. Justice ROBERTS stated in State Board v. Jackson, 283 U. S. 527, 539: 'A very wide discretion must be conceded to the legislative power of the state in the classification of trades, callings, businesses or occupations, which may be subjected to special forms of regulation or taxation through an excise or license tax. If the selection is neither capricious nor arbitrary, and rests upon some reasonable consideration of difference or policy, there is no denial of the equal protection of the law. Our duty is to sustain the classification adopted by the legislature if there are substantial differences between the occupations separately classified. *Such differences need not be great.*'

"We have sustained for purposes of taxation the classification of corporations manufacturing beer from all other manufacturing corporations (Com. v. Germania Brewing Co., supra), and we held the distinction made between them a reasonable one. Classification has been upheld between anthracite coal and bituminous coal (Heisler v. Thomas Collieries Co., supra,

affirmed 260 U. S. 237); stock insurance companies and mutual insurance companies (Com. v. Girard Life Ins. Co., 305 Pa. 558); corporate owners of taxicabs and individual owners (Com. v. Quaker City Cab Co., 287 Pa. 161, reversed on another point in Quaker City Cab Co. v. Pa., 277 U. S. 389); foreign insurance companies and domestic insurance companies (Germania Life Ins. Co. v. Com., 85 Pa. 513); money owed by individuals and money owed by corporations (Fox's App., 112 Pa. 337); stock in trust companies and stock in other associations (Com. v. Mortgage Trust Co., 227 Pa. 163, 177); and in many other situations."

What is meant by the words "special or exclusive privilege or immunity" as used in Article III, §7 of the Constitution is clear from the foregoing authorities. The question of "special or exclusive privilege or immunity" and the question whether the legislative classification was reasonable or arbitrary, arises, as clearly appears from the authorities, only when money, or position, or preferment, or taxes, or exemptions are granted or imposed by the legislature; the clause obviously has no connection or relationship with the question involved in the instant case. If, however, it be assumed arguendo that political activities could be "special privileges and immunities" within the meaning of Article III, §7, I would hold that the record is barren of facts which would enable this Court or any other Court to hold, in the light of the foregoing authorities that there were no differences or characteristics to justify the legislative classification.

To summarize:

(1) The Constitution grants, not to a city but, to the legislature the right and power to legislate. A City has no power or right of self-government or a right to frame or adopt its own Charter, except if, as, and when the legislature permits, and then subject to what-

ever restrictions and limitations the legislature may impose. The right of the City of Philadelphia to frame and adopt its own Charter is authorized by the Home Rule Amendment of 1922 and by the enabling Act of 1949 to wit, the First Class City Home Rule Act, and said Amendment and said Act, *as well as the City-County Consolidation Amendment of 1951* preserve to the legislature the right and power to impose upon the City of Philadelphia such restrictions, limitations and regulations as it may desire, provided, of course, that they do not violate the Constitution.

(2) The legislature of Pennsylvania, under the City-County Consolidation Constitutional Amendment, has the undoubted right to enact a local and special law to regulate the governmental affairs of the City of Philadelphia, and to create offices and to prescribe the powers and duties of officers of the City; and this necessarily includes the right to amend the voluminous, detailed City Charter.

(3) The Act of 1953 and §5 thereof are valid and constitutional.

(4) The provision in Article I, §16 of the First Class City Home Rule Act of 1949: "Limitations on Presenting Petitions For and the Adoption of Charters and Amendments—No proposal of a new charter or amendments of similar substance, purpose and intent shall be submitted to the qualified electors oftener than once in every five years."—even when considered in conjunction with the Home Rule Amendment of 1922—refers by its terms, and particularly by its proviso only to petitions to and resolutions of City Council and the subsequent vote of the people on the proposals submitted by Council, and has no application to an Act of the Legislature which is specifically authorized to regulate the affairs of the City by the

City-County Consolidation Amendment of 1951, which is the latest and supreme law on this subject.

For each and all of the foregoing reasons, I would affirm the judgment of the Court of Common Pleas No. 3 of Philadelphia County in each of these appeals.

---

DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

To strike down an Act of the Legislature is a deed comparable in gravity to that of affirming a death sentence in a capital case. And it is only when every natural reluctance to signing so solemn a warrant is overwhelmed by the word of the law, by the scales of justice and by the crushing weight of insuperable logic that one can assent to a deed of such appalling and irrevocable finality. I fail to see any such mind-impelling and soul-stifling coercion in this case. As a matter of fact, the cardinal principle upon which our whole system of government is founded argues deafeningly against destroying an Act of Assembly which seeks to reassert the fundamental rights of citizenship. It was because of the deprivation of political rights to participate in government that our Revolutionary War was fought; it was because of the denial of political rights of a numerous and honorable race in our land that the guns of the Civil War rent the land for four years; and it is because of a tyranny which seeks by international terror to chain mankind to the post of slavish and voiceless obedience that today our natural resources are being depleted, our treasury menaced with bankruptcy and the blood of our youth being pledged to war on distant battlefields.

The reasons advanced by my colleague Mr. Justice BELL in behalf of the constitutionality of the Act before us for consideration are not only unanswered by

the Majority Opinion and the Majority Concurring Opinion, but, it seems to me, they cannot be answered, successfully. The Dissenting Opinion filed by Mr. Justice ALLEN STEARNE also takes a commanding place in the arena of discussion here and finds no adequate response in the Opinion of the Majority or the Majority Concurring Opinion.

Mr. Justice BELL in his Dissent quotes from the Home Rule Amendment: " 'Cities may be chartered . . . Cities, or cities of any particular class, may be given the right and power to frame and adopt their own charters and to exercise the powers and authority of local self-government, *subject, however, to such restrictions, limitations, and regulations, as may be imposed by the Legislature.'* "*" Justice BELL then very properly comments that this "enabling amendment is so clear as to need no exposition." Nor has this constitutional proviso been changed by a word or syllable since it was worked into the mosaic of the supreme law of the land in the year 1922.

On August 26, 1952, the Legislature of Pennsylvania, acting in pursuance of the above quoted reservation of power, enacted a law assuring and guaranteeing to the officers and employees in the offices of Sheriff, City Commissioners, Board of Revision of Taxes and Registration Commission in Philadelphia, certain rights which had been curtailed in the Philadelphia Home Rule Charter of April 17, 1951. The Majority Opinion and the Majority Concurring Opinion speak of these restored rights as "a special or exclusive privilege or immunity." But these rights are not special privileges or exclusive immunities.

If one surveys the rest of the globe, with almost one-half of its troubled surface inhabited by people to whom

* Italics throughout, mine.

198

self-government is unknown, one could say that from a world point of view, participation in government is indeed a "special privilege," but in America such participation is guaranteed to every citizen, and it is, in fact, that very *participation* which makes America the greatest democracy in history.

The General Assembly of this Commonwealth, made up of 208 elected Representatives and 50 elected Senators, collectively speaking for over 10,000,000 Pennsylvanians, have decided that the advantages of the two party political system, which is the genius of American democracy, shall not be denied the citizens involved in this litigation. Who is there to say that the representatives of the people may not make this decision?

In the ocean of briefs, arguments, citations, statutes, charter sections and subsections upon which the issue in this case has been buffeted, windswept and storm-tossed, it is imperative, in order to avoid complete legalistic shipwreck, to keep constantly before one's eye the already quoted Home Rule Amendment. This is the chart which marks with mathematical precision the course to be followed in reaching the destination of the people's will. And that is the only port into which this litigation should be guided; it is the only objective which is constitutionally, legally and morally proper. Neither the Opinions filed by the Majority nor the long brief filed by the appellants can point to one section of the Constitution which modifies or limits the controlling Home Rule Amendment.

Much is said in deciding constitutional cases about interpreting the will and intention of the Legislature. I do not believe that one needs more than to read Act No. 433 to ascertain the will of its parent law-makers. But if any interpretation were required, it could well be that the Assembly wished to reassert, even in this small way, (in view of the one-party tyranny which

has shackled 800,000,000 inhabitants of the globe,) the adherence of the State of Pennsylvania to the principles of democracy.

I do not believe that the Legislature intended with Act No. 433 to belittle Civil Service, and certainly I do not. The merits of Civil Service have effectively demonstrated themselves over many years. Still no one could assert *ex cathedra* that the Civil Service system has reached such a superlative level of human efficiency that to advance one word in suggested improvement constitutes *lese majeste*.

There are those who sincerely believe that permanent tenure often deteriorates into slothful performance of duty and general indifference to public welfare. The comforting assurance of a non-stop pay check falling unremittingly from the heavens of permanent office-holding could well inspire the average employee into an endeavor over and beyond what is required of him in discharging the requirements of his job, but it could also corrode in him the spirit of initiative. Calling any particular system a "merit system" does not mean that it is necessarily meritorious. In any meeting of earnest citizens, there will be found those who look upon Civil Service as a guarded haven for busy bees and there are those who will consider it to be a shelter for drones and sluggards.

As recently as last year, the President of the United States indicated that the iron roof of Civil Service covered too many government employees. The New York Times of June 26, 1953, carried the item : "President Eisenhower issued today an Executive Order withdrawing Civil Service protection from about 134,000 Federal jobs, thus making it possible to dismiss Democrats holding confidential or policy-making positions.

"The order consisted merely of a paragraph amendment to a Civil Service Rule, but in forecasting the

order on Monday, Philip Young, Civil Service Commission chairman, declared that it would strengthen the merit system in the career Government service."

If it was the opinion of the United States Civil Service Chairman, and presumably also that of President Eisenhower's, that the merit system would be improved by dismissing 135,000 persons who up until that moment had regarded themselves as immovably planted on an eternal payroll, by what type of reasoning does one arrive at the conclusion that the Legislature of Pennsylvania does not have the same freedom of selection between civil service and non-civil service in the government of the City of Philadelphia?

There may be involved here a difference of opinion as to whether the wall of permanent tenure is a protection against unjust dismissal or whether it is a curtain behind which flourish ineptness, indifference and indolence, but it is because of difference in opinions that we have a United States Congress, State Assemblies, city and borough councils, township commissioners and other types of legislative bodies. The sovereign deliberative body of the Commonwealth of Pennsylvania has determined that certain offices in the city government of Philadelphia could do, and should do, without certain Civil Service features. By what right does this Court challenge the decision of the Legislature in this respect? We have said repeatedly that it is never the province of this Court to question the wisdom of a legislative policy. We can only interfere with the solemn acts of the Assembly when it goes beyond the framework of the organic law of the land. But, I repeat, there is nothing in the Majority Opinions which show that the Legislature did usurp unconstitutional powers.

In *Pittsburg's Petition,* 217 Pa. 227, this Court, speaking through Mr. Justice BROWN, emphatically de-

clared: ". . . the creation of municipal corporations, and the conferring upon them of certain powers and subjecting them to corresponding duties, *does not deprive the legislature of the state of that general control over their citizens which they before possessed.* It still has authority to amend their charters, enlarge or diminish their powers, extend or limit their boundaries, consolidate two or more into one, and overrule their legislative action whenever it is deemed unwise, impolitic or unjust, and even abolish them altogether in the legislative discretion and substitute those which are different."

The appellants, of course, do not deny that the Legislature is the supreme law-making body of the Commonwealth, but their position seems to be that once the Legislature has spoken on the subject of home rule charters, it may not speak again. The appellants would make of the Legislature on any given topic a phonograph with one record. They would regard the Legislature as an oracle of Apollo, foreseeing every possible future event, requiring it to be prepared for those anticipated happenings, and holding it to the conjectured number of umbrellas for the predicted rains and the predetermined number of parasols for the forecast sunshine. Any mistake in calculation could not be corrected and any error in divination would simply be the ill luck of the people. Fitted to a Procrustean bed by the Legislature, the people would have no right to complain, protest or repine.

Of course, it is obvious that in this respect the appellants write their contention in water for the Legislature is intended to be a living, speaking mirror of the people's will of today and not a museum of miscalculated prophecies. History teaches that the ideal in any given phase of government is attained only after debate, experimentation and even trial and error. Al-

though no saving clause for future legislative interposition was needed, nonetheless the Consolidation Amendment specifically provided for future legislative action through Section 7: "Upon adoption of this amendment all county officers shall become officers of the city of Philadelphia, and, *until the General Assembly shall otherwise provide,* shall continue to perform their duties and be elected, appointed, compensated and organized in such manner as may be provided by the provisions of this Constitution and the laws of the Commonwealth in effect at the time this amendment becomes effective, but such officers serving when this amendment becomes effective shall be permitted to complete their terms."

The General Assembly has now, by a duly enacted statute, *otherwise provided.* The decision of the Legislature may be disappointing, even disillusioning, to the good citizens who worked indefatigably and conscientiously in the drafting and advocacy of adoption of the Philadelphia charter, but they must bow to the will of the people as spoken through their representatives in Harrisburg.

Appellants argue in their brief that Section 5 of the Legislative Act of August, 1953, "provides that the former county offices are re-constituted and that they shall be governed as if the City-County Amendment *had never been adopted."* This is exaggeration without benefit of allegory. There is no such intention, express or implied, in the Act. As a matter of fact, the very Declaration of Purpose of the Act definitively proclaims: "The purpose of this act is to *carry out the intent and purpose of Article XV, Section 1 of the Constitution of Pennsylvania, known as the 'Home Rule Amendment',* and Article XIV, Section 8 of the Constitution of Pennsylvania, known as the 'City-County Consolidation Amendment'."

I do not detect in Act No. 433 any lack of sympathy on the part of the Legislature for Philadelphia home rule. At the same time I can see in the Act a firm intention on the part of the legislators of the Commonwealth to assert their power to protect the rights of American citizens in such manner as they regard proper and salutary for the best interests of Philadelphia and the Commonwealth.

The Majority and Majority Concurring Opinions seek to rationalize their demolition of Act No. 433 by pointing out what they regard as inconsistencies in the Act. They point out that elective officers are joined with appointive officers, that clerks in certain offices are to be controlled by civil service, that clerks in other offices are to be free from civil service, and that some classifications are arbitrary. Most Acts of the Assembly are bound to be arbitrary in the sense that they affect, alter or abolish the status quo in any given situation. That is the very nature of a legislative act, and we have no right whatsoever to enter into the legislative halls to raise a hand in objection to what is transpiring there unless we see a clear violation of the Constitution. We have made this judicious, sagacious and salubrious aloofness plain in a number of decisions. In *Commonwealth v. Grossman*, 248 Pa. 11, 15, the renowned Justice MESTREZAT, speaking for the Court, said: *"The legislature is the sole judge of the wisdom and expediency of a statute,* as well as of the necessity for its enactment, and whether the legislation be wise, expedient or necessary is without importance to the court in determining its constitutionality. In other words, the assembly has a free hand to legislate on every subject in such a manner as it deems proper unless there is a constitutional prohibition clearly expressed or necessarily implied."

Is there any reason why this perspicacity should

not be observed in the case before us? We have no right to veto the solemn pronouncements of the Legislature, which, after constitutional deliberation, has decided that the employees in four Philadelphia offices shall be allowed freedom in political activities.

The phrase, "political activities," does not of itself import misconduct or impropriety. It is true that during the last several decades the phrase has, in certain associations, taken on a connotation which certainly is not included in the scope of Act No. 433. The Legislature never intended to imply, (nor can any one reasonably read into the Act any such implication,) that there is something evil in a government worker's holding or expressing any idea on what is best, politically, for the city, state or nation.

The incredible paradox is that while some political science academicians see something calamitous in a typist or file clerk expressing a preference for mayor, governor or president, they at the same time argue strenuously for free speech for Communists (using the glib phrase of "a market place of ideas.") As recently as January 25, 1954, Mr. Justice JONES, speaking for the majority of the Court in the case of *Commonwealth v. Nelson*,* 377 Pa. 58, 104 A. 2d 133, stated that the right of all individuals (including Steve Nelson, atom bomb spy and leader of the Communist Party of Western Pennsylvania), "to speak freely and without fear, even in criticism of the government, will at the same time be protected."

In striking down Act No. 433, the Majority do not define the boundaries of the "political activities" therein referred to. What distinction is to be made between

---

* The majority of the Court in this case consisted of Chief Justice STERN, and Justices STEARNE, JONES and CHIDSEY. Justice BELL wrote a vigorous dissent. Neither Justice ARNOLD nor I participated in the deliberation or decision of the case.

a Communist castigating the government and a clerk in the Sheriff's office criticizing the Mayor, the Governor or the Secretary of State? According to the Court's reasoning in these two cases, the Communist will be protected in free speech even in urging a change of government, but the clerk who may express a desire to see a change of mayor, councilman, governor or congressman, will be discharged. This is not the traditional American way of doing things. And as custom and tradition made the British common law, so have American custom and tradition entered, through statute and judicial interpretation, into the warp and woof of American law.

As recently as Monday, March 22, 1954, (as reported in the Philadelphia Inquirer of March 23, 1954), the leaders of both the Republican and Democratic Parties urged citizens to a greater participation in political activities. Speaking in Philadelphia at the 50th Anniversary Dinner of the Committee of 70, Leonard W. Hall, Republican National Chairman, declared that the citizen's place in politics was "never more important," than today. He said that the national administration under the leadership of President Eisenhower, "invited participation and urged continued interest of the average voter to achieve a truly citizen government."

Stephen A. Mitchell, Democratic National Chairman, said that a citizen cannot be effective "if he stands aloof from party politics" and restricts his interest in government to voting. He emphasized that to be fully effective, "citizens must participate in selections of party officials and candidates."

Neither one of these distinguished citizens of the United States suggested that the employes of the four offices involved in this litigation are not citizens in the fullest sense of the word.

The reason for the comparatively short terms allotted to Congressmen, assemblymen, mayors and councilmen is to allow the people opportunity at reasonable intervals to pass judgment upon the work of their representatives. That work can only be properly evaluated and appraised through the fullest expression by those who observe, those who study, and those *who engage in the work itself*. There are statutes on the books to punish those who misuse their official positions for private profit or for coercive succession in office.

With the extensive dissemination of news today through the competitive and cumulative media of newspapers, magazines, radio and television, there is but little chance for a repetition of the abuses which made up so many governmental scandals of the past. It was therefore for the Legislature to decide whether "political activities" would be conducive to any such repetition, and the Legislature has decided that such danger has melted away in the crucible of public knowledge and public awareness to what constitutes proper "political activities."

The Majority Concurring Opinion condemns Act No. 433 because, inter alia, it does not grant or deny the privilege of political activity to *all* City employes, but only to the employes of four particular City offices. This the Justices in the Majority Concurring Opinion regard as an arbitrary selection. The Pennsylvania Legislature may make such selection as it sees fit. It may for purposes of experimentation try out four offices and then other offices later. If, however, (as the appellants and the Majority of the Court seem to contend,) removing the cloak of Civil Service from the backs of certain employes will subject to them a rigorous political climate from which they should be protected, the action of the Legislature, then,

to that extent, is giving shelter and warmth to those not included within the scope of Act No. 433. Equality of privilege does not mean equality of misery.

The discussion of local and special laws in the Majority Concurring Opinion is well answered in Justice ALLEN STEARNE'S learned Dissent, and all other arguments in behalf of unconstitutionality projected in both the Majority and Majority Concurring Opinion, are exceedingly well covered in Justice BELL'S distinguished Dissent. I, therefore, terminate my Dissent with the statement that so long as Philadelphia is part of Pennsylvania, the General Assembly will legislate for it with all the powers conferred upon it by the Constitution. As far back as 1870, the celebrated Mr. Justice SHARSWOOD, speaking for this Court, said: "The City of Philadelphia is beyond all question a municipal corporation. . . It is merely an agency instituted by the sovereign for the purpose of carrying out in detail the objects of government—*essentially a revocable agency*—having no vested right to any of its powers or franchises—the charter or act of erection being in no sense a contract with the state—and therefore fully subject to the control of the legislature, who may enlarge or diminish its territorial extent or its functions, may change or modify its internal arrangement, or destroy its very existence, with the mere breath of arbitrary discretion." (*Philadelphia v. Fox*, 64 Pa. 169, 180 (1870))

Thirty years later, Mr. Justice MITCHELL emphasized the same irrefutable doctrine in the case of *Commonwealth v. Moir*, 199 Pa. 534, 541: "Municipal corporations are agents of the state, invested with certain subordinate governmental functions for reasons of convenience and public policy. They are created, governed, and *the extent of their powers determined by the legislature, and subject to change, repeal, or total*

*abolition at its will.* They have no vested rights in their offices, their charters, their corporate powers, or even their corporate existence. This is the universal rule of constitutional law, and in no state has it been more clearly expressed and more uniformly applied than in Pennsylvania."

The right to participate in political activities is one of the fundamental rights that a citizen enjoys. It is in this manner that he most effectively identifies himself as part of the great Commonwealth. The clergy, the newspapers, civic organizations and other public-spirited groups urge in every election campaign that the people vote. Voting alone is not enough. Voting ignorantly can cause more harm than not voting at all because in blindness one may press the lever which will open the door to a candidate bent on mischief or another wholly without qualification or experience for the office sought. Conscientious study, intelligent observation and untrammeled discussion make for an enlightened citizenry,—and an enlightened citizenry makes for good government.

As I would not gag or shackle the lowliest citizen in the United States in his desire to participate in this government which exists for him, I would not padlock the lips or throw political chains around any citizen in,—of all places,—Philadelphia, the very cradle of liberty!