Schultz *v.* Philadelphia, Appellant.

Argued April 16, 1956.   Before Stern, C. J., Jones, Bell Chidsey, Musmanno and Arnold, JJ.

*David Berger,* City Solicitor, with him *Murray H. Shusterman* and *Abraham Wernick,* Deputies City So-

licitor, and *Levy Anderson,* First Deputy City Solicitor, for appellants.

*Henry J. Morgan,* with him *Marshall H. Morgan,* for plaintiff, appellee (No. 221).

*Wm. Barclay Lex,* with him *Joseph P. Flanagan, Jr.,* and *Thomas M. Hyndman, Jr.,* for plaintiff, appellee (No. 222).

OPINION BY MR. CHIEF JUSTICE HORACE STERN, April 20, 1956:

On February 2nd, 1956, there was introduced into the Council of the City of Philadelphia a resolution proposing certain amendments to the City Charter, and, on the same date, a bill providing for their submission to the electorate on Primary Election Day, April 24th. The proposed amendments were three in number, only two of which, however, require consideration in the present proceedings. In effect they changed section 7-301(a) of the Charter by exempting from civil service provisions all employes in the City's elective offices, and section 10-107(4) by relieving all such employes from the prohibition of political activities.

The resolution and the bill were duly advertised and a public hearing was held on February 8th. On February 16th an amended resolution was adopted by the Council, and on February 23rd an amended bill was passed which was approved by the Mayor on March 7th. The amendments to the original resolution and bill consisted in excluding the employes of the Mayor's office from their provisions, thereby differentiating such employes from those of other elective offices and assimilating them to the employes of appointive offices in regard to civil service and political activity. No

further advertisement was made or public hearing had for the consideration of the legislation as thus amended. Accordingly the Court below (BOK, FLOOD and LEVINTHAL, JJ.) held that the procedure was fatally defective in failing to meet the requirements of section 2-201 of the Charter in regard to amendments and to the advertisement and holding of public hearings.

There can be no question but that an ordinance is invalid if it fails to comply with legal requirements of this nature: *Fierst v. William Penn Memorial Corporation*, 311 Pa. 263, 166 A. 761; *Kelly v. Philadelphia*, 382 Pa. 459, 115 A. 2d 238. While it is obvious that an insignificant amendment made to a proposed ordinance after advertisement and a public hearing does not require a re-advertisement and public hearing the case is clearly otherwise if the amendment is substantial in relation to the legislation as a whole. The object of a public hearing is to enable the legislative body to ascertain preliminarily the views of members of the public in regard to the proposed legislation, but if such views are not sought after the legislation has been substantially amended subsequent to the public hearing the entire purpose of the prescribed procedure would be defeated. The court below found, for reasons set forth in its opinion, that the change concerning the employes of the Mayor's office was a substantial one, more particularly because it destroyed the uniformity of the class of offices to which the amendments originally were intended to apply, such uniformity being a vital factor in the consideration both of policy and, to some extent, of constitutionality. Those reasons need not be here repeated, but they justify the court's decision.

There is, however, a much more important question to be considered on the present appeal than that of a procedural defect in the passage of the ordinance.

The amendments which it is proposed to submit to the electorate are clearly invalid. It will be remembered that an Act of the Legislature of August 26, 1953, P. L. 1476, §5, attempted to accomplish the very same object as is now sought by the proposed amendments to the Charter. That Act provided that the employes of the offices of the Sheriff, the City Commissioners, the Board of Revision of Taxes, and the Registration Commission, should be exempted from Civil Service regulations and should be allowed to engage in political activities. The only present difference is that other offices are singled out for the application of this identical legislation, those of the District Attorney, Clerk of Quarter Sessions and City Controller being substituted for the offices of the Board of Revision of Taxes and the Registration Commission. In *Clark v. Meade*, 377 Pa. 150, 104 A. 2d 465, we held that section 5 of the Act of 1953 violated Article III, section 7, of the Constitution, which forbade the Legislature to grant to any individual any special or exclusive privilege or immunity, in that it gave the right to employes—assistants, clerks, stenographers and others—in some offices to be politically active, while denying the same privilege to employes in other offices performing precisely the same type of work and under the same classification.

The question arises, therefore, whether the municipality of Philadelphia possesses the power to enact this proposed measure, which, we have held, the Legislature of the Commonwealth itself cannot constitutionally enact. If the City does possess such power it can be only by virtue of the grant made to it by the Legislature of the right of self-government, since all powers of every municipality or political subdivision of the Commonwealth are solely derivative; a city is not a sovereign political entity but is strictly the creature of the

Legislature.* In granting to the City of Philadelphia the right to frame and adopt its own charter and to exercise the powers and authority of local self-government, did, then, the Legislature include in such grant the power to enact the measure here under consideration? That the answer to this question must be in the negative would seem so wholly obvious as to require little, if any, elucidation. The Constitution, Article XV, Section 1, provided that cities might "be given the right and power to frame and adopt their own charters and to exercise the powers and authority of local self-government, *subject, however, to such restrictions, limitations, and regulations, as may be imposed by the Legislature.*" The actual legislative grant of such powers was made by the enabling Act of April 21, 1949, P. L. 665, Section 17 of which provided that "The charter of any city adopted or amended in accordance with this act may provide for a form or system of municipal government and for the exercise of any and all powers relating to its municipal functions, not inconsistent with the Constitution of the United States or of this Commonwealth, *to the full extent that the General Assembly may legislate in reference thereto as to cities of the first class, . . .*". It is contended that Article III, Section 7, of the Constitution, forbidding the General Assembly to pass any local or special law as to some

---

* The subordinate position of municipalities as compared to the Commonwealth itself was graphically portrayed by Mr. Justice SHARSWOOD in *Philadelphia v. Fox*, 64 Pa. 169, 180, by Mr. Justice MITCHELL in *Commonwealth v. Moir*, 199 Pa. 534, 541, 49 A. 351, 352, and by Mr. Justice KEPHART in *Shirk v. Lancaster City*, 313 Pa. 158, 162, 169 A. 557, 559, all of whom pointed out that municipal corporations are mere creatures of the State, being governmental agencies established for the purpose of carrying out in detail the objectives of local government, and subject even to extinction at the will of the Legislature.

28 subjects of legislation, is an inhibition in terms only on the action of the Legislature, and that the City of Philadelphia is therefore not bound thereby. But, as already stated, the enabling Act of 1949 gave to the City powers only "to the full extent *that the General Assembly may legislate in reference thereto as to cities of the first class,*" that is to say, no more and no less, which is an express declaration, if any were needed, that the Legislature was *not* giving to the City any powers *beyond its own powers of legislation with reference to the City of Philadelphia.* Therefore, in granting the right to adopt and to amend the City Charter it did not grant the power here asserted by the City because, as we held in *Clark v. Meade,* supra, the Legislature did not possess such power and could not itself enact this same measure.

It is suggested that even if the Council cannot accomplish this legislation the people of Philadelphia can do so by a vote at the polls. This represents a misconception of the nature of our system of representative government, national, state and local. The people themselves cannot enact legislation by popular vote and the inhabitants of a municipality have only such powers of direct legislative action as are granted them by the Constitution which they adopted and by the Legislature of the State acting thereunder. Here the legislative grant of power to adopt and amend a City Charter was made, not to the City Council, but to the *City* itself, that is to say, to the people of Philadelphia to whom it gave the power to express their approval or disapproval thereof, but this grant to the City was expressly made only to the extent, and subject to the extent, of the powers of the Legislature as above noted, and which, therefore, cannot be transcended by a referendum vote of the people any more than it could be by their own legislative representatives.

It is urged that the Court should not pass upon the validity of the proposed legislation at this time but should defer a decision thereon until after the measure shall have been voted upon at the polls. We cannot subscribe to this point of view. The question of validity has been argued before us by all parties in interest, and since, as a result thereof, we are convinced that the legislation is in fact invalid, it would seem to us to be wholly unjustified to allow the voters to give their time, thought and deliberation to the question of the desirability of the legislation as to which they are to cast their ballots, and thereafter, if their vote be in the affirmative, confront them with a judicial decree that their action was in vain because of the reasons herein set forth.

It remains only to point out what the extraordinary effects of a decision would be that would permit the City of Philadelphia to grant special or exclusive privileges or immunities to any corporation, association, or individual. If it could arbitrarily grant to an assistant, a clerk, a stenographer, a telephone operator, or any other employe in one of the City's governmental offices the right to engage in political activities while denying the same privilege to a similar employe in another office, it could similarly grant, let us say, to one store or one factory a privilege that it denies to another of exactly the same kind, or to the owner or tenants of one dwelling what it denies to the owner or tenants of another identical dwelling, or to some individuals or groups a privilege,—let us say—to use public facilities, libraries, swimming pools, playgrounds, etc., while denying it to others, and so on; possible illustrations might be multiplied ad infinitum. Indeed, if the City, because of the nature of the powers granted it by the Legislature, is not bound by the prohibitions contained in Article III, Section 7, of the

Constitution with reference to granting special or exclusive privileges or immunities it would possess a power which would free it from constitutional restraints essential to the preservation of the equality of individual rights.

For the reasons thus stated we affirm the decree of the court below.

Mr. Justice CHIDSEY and Mr. Justice ARNOLD join in this opinion.

Mr. Justice BELL concurs in the result reached by the lower court and by this Court.

---

DISSENTING OPINION BY MR. JUSTICE JONES:

I would reverse and dismiss the bill of complaint for the reason that the action of the learned court below was based on patently untenable ground and no other matter is properly before us for review *at this time.*

The court below held, and this court now confirms, that the procedure followed by Philadelphia's City Council in the enactment of the ordinance providing for the proposed amendments to the City's Home Rule Charter was "fatally defective in failing to meet the requirements of section 2-201 of the Charter in regard to amendments and to the advertisement and holding of public hearings." That conclusion is plainly erroneous as the able and, to me, unanswerable brief of the City Solicitor irrefutably demonstrates *on the basis of heretofore established law.*

In passing, it may be noted that the mere introduction by current judicial legislation of the word "substantial" as the test for determining whether a change in a bill by amendment in committee of Council requires a second public hearing for its validity, when passed, will veritably open the floodgates of litigation

involving legislation during the course of its passage in City Council and make a mockery of Home Rule. No other municipality in Pennsylvania is so bound. No ordinary town council will be so constricted.

But, we need treat here no longer with the procedure in Council, either in general or in detail. As this court now declares, the reasons advanced by the court below for its action in the instant case are correct and controlling. If that be so, then that is precisely where this court's opinion should have stopped, viz., at the end of its third paragraph. Certainly, that is all that was necessary to the decision of affirmance.

Instead of so doing, however, the majority of this court, in plain disregard of long-established and uniform court practice, has seen fit to go ahead and decide a constitutional question related to the *substance* of the assailed amendments. In short, having prevented the proposed amendments from being effectively voted upon at the primary on April 24th, the majority take up the constitutional question and thereby give the amendments the *coup de grace* for all time. That decision in its implications and ramifications will prove to be a greater blow to the efficient administration of Philadelphia's government under home rule than can now be imagined; and, the matter of the two proposed amendments sinks into relative insignificance.

The reason for the majority's action in unnecessarily passing upon the constitutional question at this time is, to me, truly inexplicable. It is a cardinal rule appertaining to the juridical function that a constitutional question is not to be passed upon unless its solution is absolutely essential to the decision of the matter before the court. In *Commonwealth, to use, v. Picard*, 296 Pa. 120, 124, 145 A. 794, we said that "It is a fundamental rule that a court will never pass on

the constitutionality of a statute unless it is absolutely necessary to do so in order to decide the cause before it." See, also, to like effect *Sablosky v. Messner,* 372 Pa. 47, 60, 92 A. 2d 411; *Altieri v. Allentown Retirement Board,* 368 Pa. 176, 180, 81 A. 2d 884; *Millcreek Township School District v. The Star Theatre, Inc.,* 172 Pa. Superior Ct. 291, 294, 94 A. 2d 53; and *De-Sarro v. Snowdon,* 157 Pa. Superior Ct. 150, 154, 42 A. 2d 89. This basic rule has been reiterated and applied so many times by the Supreme Court of the United States as not to require extended citation here. An interesting example is *Ashwander v. Tennessee Valley Authority,* 297 U.S. 288, 347, where Mr. Justice BRANDEIS in his concurring opinion, after stating the rule, illustrated it as follows: "Thus, if a case can be decided on either of two grounds, one involving a constitutional question, the other a question of statutory construction or general law, the Court will decide *only* the latter" (Emphasis supplied).

But, worse still, the constitutional question which the majority has dragged in for decision was injected into this proceeding prematurely; and, even now, it is not ripe for decision.

The jurisdiction of a court of equity may not be invoked to enjoin the enactment of a bill during the course of its passage through a legislative body. Such is the preponderant weight of authority throughout this Country and I say that without fear of successful contradiction.[1] Would anyone have the temerity to

---

[1] E.g., see: *Fletcher v. City of Paris,* 377 Ill. 89, 35 N.E. 2d 329, 331, 333; *Duggan v. City of Emporia,* 84 Kan. 429, 438, 114 P. 235; *Bardwell v. Parish Council of Parish of East Baton Rouge,* 216 La. 537, 543, 44 So. 2d 107; *Power v. Ratliff,* 112 Miss. 88, 97-102, 72 So. 864; *State, ex rel., Kittel v. Bigelow,* 138 Ohio S. 497, 501, 37 N.E. 2d 41; *State ex rel. Cranmer v. Thorson,* 9 S.D. 149, 153, 154-157, 68 N.W. 202; see also *State ex rel. Andrews v. Quam,*

suggest that the Court of Common Pleas of Dauphin County, sitting in equity, would extend its jurisdiction to a complainant who sought to enjoin the enactment of a bill during its passage through the legislature even though it was conceded on all sides that the bill, if passed, would be a gross and palpable violation of the Constitution?

In *State v. Bigelow,* 138 Ohio S. 497, 501, 37 N.E. 2d 41, which involved mandamus and injunction proceedings instituted to enjoin submission of proposed amendments to the home rule charter of the City of Cincinnati, the Supreme Court of Ohio said "As for the first ground, that the proposed charter amendment, if passed, would be in contravention of the Constitution of Ohio, it need only be said that it is prematurely raised in these actions. This court has repeatedly held that it will not interfere with the legislative process, either by mandamus or by injunction, to prevent the enactment of laws, *simply because it is claimed that such legislation when passed will be unconstitutional.* . . . We hold therefore that the question whether the charter amendments here involved will be constitutional, when and if approved by the electors, is prematurely raised and not judicially cognizable" (Emphasis supplied).

It is implicit in *State v. Bigelow,* supra, that a referendum of the people for passing upon an ordinance, regulation or amendment of a home rule charter is an essential part of the legislative process. Such, indeed, was the direct ruling in *Bardwell v. Parish Council,* 216 La. 537, 550, 44 So. 2d 107, where it was said that "in those [referendum] elections, it is the people them-

---

72 N.D. 344, 348, 7 N.W. 2d 738; *City of Austin v. Thompson,* 147 Texas 639, 644-645, 219 S.W. 2d 57. For further authority see 19 A.L.R. 2d 519.

selves who legislate. . . . In truth, it is direct legislation, a power reserved to the people in contrast to a right granted to them." It was further said in that case that "the rule that a court of equity will not interfere with proposed acts of legislation by a municipal council is, a fortiori, applicable to initiative and referendum elections . . . ."

Only this week in *Addison Case,* 385 Pa. 48, we recognized that the adoption of the Home Rule Charter by the electorate of Philadelphia was an act of legislation. We there said "Where [a charter] is adopted by a constitutionally empowered electorate, it affords an example of pure democracy—the sovereign people legislating directly and not by representatives in respect of the organization and administration of their local government. Specifically, therefore, Philadelphia's Home Rule Charter constitutes legislation (i.e., the adoption or enactment of a law by a competent body) just as much as did the City's Charter of 1919 which the legislature itself enacted. . . . There is no special virtue in the word 'legislative' merely because it stems from the same root as 'legislature'."

The remedy against an allegedly illegal or invalid election is an injunction to restrain or quo warranto to oust *after the results of the election have been determined.* In *Smith v. McCarthy,* 56 Pa. 359, which dealt with an act of assembly providing for the consolidation of the City of Pittsburgh with some surrounding territory upon a favorable vote of the electorate involved, such an election was held. After the consolidation of the one district which had voted favorably, (out of three districts participating), a taxpayer sought to enjoin the election of a mayor, council, etc., by the vote of the consolidated district on the ground that the enabling Act was unconstitutional. This court held that it had no power to enjoin the election and

that the complainant's remedy lay in attacking by quo warranto the right of the elected officials to their offices.

The expenditure of public funds for holding what may later prove to have been an abortive election furnishes no valid reason for departing from the rule against a premature determination of a constitutional question arising in connection with the election. As was said in *City of Austin v. Thompson,* 147 Tex. 639, 648, 219 S.W. 2d 57, "It is of vastly greater importance that the courts refrain from interfering with the exercise of political functions." And that is especially so where the referendum is fixed for the time of a regular election: *Power v. Ratliff,* 112 Miss. 88, 93, 72 So. 864. Here, the referendum is not only fixed for the time of the primary but amendment No. 3, which is not in controversy, will be voted upon at that election. Hence, neither expense nor inconvenience can justify judicial interference with the election by deciding *prematurely* a constitutional question that could and should be decided after the election.

The evil of the current decision lies not alone in the fact that it openly violates an unquestionable rule of decision applicable to constitutional questions but it actually decides the constitutional question erroneously. The inhibition of Article III, Section 7, of the State Constitution is directed against the General Assembly and not against a municipal council, and the word "law" as used in Article III, Section 7, means an act of the legislature and not an ordinance of a municipality. Those rules were enunciated by this court years ago and up to now have never been questioned or disregarded. See *Baldwin v. City of Philadelphia,* 99 Pa. 164, 170-171.

But, now, by an oversimplification of reasoning the majority hold that Article III, Section 7, applies to the

Council of the City of Philadelphia because the legislature in the Home Rule Enabling Act of April 21, 1949, prescribed that a charter formulated under the Act could authorize the City's exercise "of any and all powers relating to its municipal functions, . . . to the full extent that the General Assembly may legislate in reference thereto as to cities of the first class . . . ." That was a grant to the full extent of the General Assembly's power and not a limitation on the reserved power in the people from the very nature of our constitutional system.

The majority, however, conclude that the inhibitions in Article III, Section 7, in respect of the General Assembly's passage of any local or special law attached, *ipso facto*, to the Council of Philadelphia by virtue of the Home Rule Enabling Act. There is no justification whatsoever for fastening upon a municipality operating under a home rule charter the constitutional inhibitions on the General Assembly which were intended to curb the legislature from interfering in local affairs. In *Klingler v. Bickel*, 117 Pa. 326, 337, 11 A. 555, where Article III, Section 7, was directly involved, this court said "The object of the constitutional provision was clearly to prevent the legislature from interfering in local affairs by means of special legislation; and, if the town councils of cities and boroughs cannot regulate them, they are in a bad way indeed." The restraint will prove to be a body blow to home rule.

Of course, the City is bound by both the National and State Constitutions. That goes without saying. For example, it may not deprive a person of life, liberty or property without due process of law; it may not impair the obligation of a contract; nor incur indebtedness except in a certain prescribed manner; nor increase its indebtedness beyond certain limits; etc. But

Philadelphia's City Council is not bound by the State constitutional inhibition against the General Assembly's enactment of local or special laws. One of the most important reasons for the adoption of Home Rule is to so emancipate a municipality that it can legislate locally in a manner not constitutionally permitted the legislature.

And, where would the imposition on the City of Article III, Section 7, lead? If Council may not do one of the prohibited things, then it may not do any of the other interdicted subjects of legislation contained in that Section. Accordingly, the City will be unable to change the names of places; it will be unable to authorize the laying out, opening, altering or maintaining roads, highways, streets or alleys; it may not ordain with respect to the bridges over streams within its borders; it may not vacate roads, town plats, streets or alleys; it can take no action relating to cemeteries, grave yards or public grounds not belonging to the City; it may not provide for the opening or conducting of elections or fixing or changing the place of voting; nor may it create offices or prescribe the powers and duties of officers. Yet, an incorporated municipality, not under Home Rule, possesses power to legislate in regard to all of the above listed subjects and Philadelphia had such power under its Charter of 1919. See *Klingler v. Bickel,* supra, and *Baldwin v. City of Philadelphia,* supra.

Still further reasons why Article III, Section 7, of the Constitution does not apply to Philadelphia could be advanced. But, time does not admit of the extension. Had this appeal been handled in keeping with what I take to be compelling rules for judicial decision, this court would have reversed the decree and dismissed the bill as an attempt to enjoin an election. The proposed amendments would then have been voted

on at the referendum on April 24th. If they were defeated, there would be no question, constitutional or otherwise. If, however, they received a favorable vote, then an injunction against their enforcement could be sought and, if held to be unconstitutional, enforcement would be enjoined. Thus, without depriving anyone of a right, we would have time, not during a busy court sitting, to give the constitutional question the thorough consideration which its importance and portents rightly demand.

Finally, having thus arbitrarily foisted the inhibition of Article III, Section 7, on the City, the majority hold that, under the ruling in *Clark v. Meade,* 377 Pa. 150, 104 A. 2d 465, the City Council is incapable of increasing the number of exemptions of employees from the civil service restraint upon political activity. Nothing could be more fallacious. It by no means follows so simply that what the legislature could not do by local law affecting the civil service provisions of Philadelphia's Home Rule Charter, the people of that City may not do by their affirmative vote at a referendum on proposed amendments. *Clark v. Meade* did not rule to the contrary or even so imply. In the concurring opinion in that case, which three of us co-authored, the question of the City's power in the premises was expressly reserved. And, it was pretty nearly implicit in the concurring opinion, at least I thought so, that the City had such power, when we said,—"It has been suggested that the result of the majority opinion will be to make it constitutionally impossible even for the *people* of Philadelphia, to disestablish civil service or to permit the employees of some of the City departments, and not others, to be politically active. That question is likewise not here involved. But, since it has been injected into the discussion, it is not amiss to point out that we are neither holding nor even im-

plying that a resolution of Council, approved by a vote of the people (the procedure for amending the Charter), is the passage of a law within the contemplation of Article III, Section 7, of the Constitution whose operative prohibitions are directed against the passage by the legislature of certain laws."

DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

If the decision handed down today in this case had been promulgated behind the Iron Curtain it might well have been characterized as an illustration of the absolutism which can deprive the people of a voice in their government. The majority of this Court says that the people of Philadelphia are not qualified to pass upon two simple questions submitted to them by their own duly elected representatives, but the majority fails to state *why* the people are to be disfranchised on a matter involving their own government. One of the submitted questions asks whether the Philadelphia Charter should be amended to allow all officers elected by the people (with their employees) except the Mayor, to be withdrawn from civil service; the other asks whether all officers (and their employees) with the exception of the Mayor, shall be exempt from the prohibition against political activity.

The plaintiffs who have sought and obtained an injunction against the submission of these questions to the people quite clearly desire that both questions be answered in the negative. If the changes contemplated in the questions are bad for the people they would certainly vote them down, and the resulting vote would therefore achieve the result intended by the plaintiffs. If they are good for the people, the people would vote in the affirmative. The plaintiffs have blocked the proposed referendum out of fear that the people might

approve the amendments because, obviously, if they believed the people would reject the amendments, they (the plaintiffs) would have spared themselves the expense, time, energy and work involved in initiating this litigation. In that aspect of the case, it is pertinent to inquire on what pedestal do the plaintiffs stand that they can presume to determine what is good and what is bad for the people.

The right of the people to decide any question which affects their welfare is a right enshrined in the Constitution of the United States, the Constitution of the State of Pennsylvania, and, so far as Philadelphia is concerned, in the Home Rule Charter itself. The framers of the Enabling Act and the Charter itself never believed, anticipated, or even desired that their work was to be regarded as impeccably perfect and to be forever free from change. The Home Rule Act of April 21, 1949, P. L. 665, under whose provisions the Charter was framed, outrightly provides for amendment: "Amendments to Charter—Amendments to the charter for the government of any city may be proposed by a resolution of the city council adopted with the concurrence of two-thirds of its elected members . . . The proposed new charter or amendments shall be submitted to the electors for approval or disapproval by the use of the ballot questions . . ."

The City Council of Philadelphia meticulously followed the procedure outlined by law in enacting the ordinance (No. 125) which is the subject of this lawsuit, and in submitting it to the people for approval or rejection. The lower Court declined to allow the people to pass upon the submitted questions not because of any parliamentary defect in the passage of the ordinance, but because it believed that it knew better than Council what was best for the City. But the Charter did not make of Court of Common Pleas No. 6

an upper chamber to the Philadelphia City Council. Court of Common Pleas No. 6 has no legislative powers whatsoever.

Seemingly acting as a self-constituted Senate to the City Council, Court of Common Pleas No. 6 declared that by enacting Ordinance No. 125 the Council "restored the 'hodge podge' of civil service in all appointive offices plus one elective office and no civil service in all elective offices minus one." It should be of no concern to Court of Common Pleas No. 6 whether the action of the City Council results in a so-called hodge podge. Furthermore, what might seem to be hodge podge to Court of Common Pleas No. 6 might be very good government in the eyes of those entrusted by the people with the responsibility of legislating for the City. As Rome was not built in a day, the government of Philadelphia cannot be rendered perfect with one sweep of a legislative wand. The perfect state is achieved by degrees and not by one avalanching action. What appears like hodge podge to Court of Common Pleas No. 6 is obviously part of a plan that will eventually give to Philadelphia the government that will best fit its needs, its aspirations and desires. It takes time, planning, study and restudy to erect the perfect structure which will house every reasonable demand of the population for ideal democratic government.

No government, business, or institution of any kind can operate on the principle that all those who make up the establishment must have exactly similar duties and exactly the same regimented status. The functions to be performed and the results to be attained inevitably require that every individual within the establishment be assigned that work and that classification which will make his contribution to the final result the best possible in the whole ensemble of the operation. Any person with vision can perceive this. One

without vision cannot. The captious critic unschooled in building projects will see in all the stones, bricks, beams, mortar and marble blocks scattered on the ground a mere hodge podge, but the builder with vision will see the completed cathedral. The person ignorant in the arts will call the different pieces and varying colors of an unassembled mosaic a mere hodge podge, but the artist viewing the same material looks ahead and envisions the completed masterpiece of color, form and harmony. The untrained ear in musical appreciation will hear only a hodge podge of sounds as it listens to an orchestra rehearsing, but the musician will hear in his inner soul the completed symphony of power and beauty.

In a vast enterprise, such as the government of Philadelphia which employs some 30,000 persons, it is impossible to make every single employee a civil service subject, nor would such a design make for the best government. It has by no means been scientifically demonstrated that the best government is the one which guarantees permanent tenure to every person on the government payroll at any given time.

Universal civil service exists nowhere except in totalitarian regimes. In my Dissenting Opinion in the case of *Clark v. Meade*, 377 Pa. 150, 199, I pointed out that even the President of the United States did not favor an all-inclusive civil service. I there quoted from the New York Times of June 26, 1953, which carried the item: "President Eisenhower issued today an Executive Order withdrawing Civil Service protection from about 134,000 Federal jobs, thus making it possible to dismiss Democrats holding confidential or policy-making positions.

"The order consisted merely of a paragraph amendment to a Civil Service Rule, but in forecasting the order on Monday, Philip Young, Civil Service Commis-

sion chairman, declared that it would strengthen the merit system in the career Government service."

With all the undoubted advantages which go with a well-administered civil service system, it would be calamitous in a democracy to assure every person who once mounts a government payroll that he will ride forever on the backs of the taxpayer. Without healthy rivalry and wholesome competition, progress slows down to an eventual stop, and the human spirit stagnates as a weed in still water. The very genius of our form of government is the two-party system but if every employee of the State is to be given a fee simple title to his job, unrelated to approval or disapproval of the people, government will degenerate into barren bureaucracy and the will to achieve will rust like an unused machine. The Charter recognizes this truism and so declares: "Absolutism in this area is neither necessary nor practicable for the fact is that political parties are essential parts of the democratic form of government in the United States."

Even in the Philadelphia Charter Act of June 25, 1919, P. L. 581, differentiation in civil service was provided for. Section 28 of Article 19, 53 P.S. §3347, declared: "Nothing in this article shall be construed to apply to the officers and employes of any office, department, bureau, commission, board, or trust, not now administered under the existing civil service laws." In the case of *Fruend v. Cox*, 321 Pa. 548, 551, this Court stated that the Civil Service provisions in the Act of 1919 had no application to City Council and its employes. Nor is the Civil Service Act of the Commonwealth of Pennsylvania (August 5, 1941, P. L. 752) all-inclusive.

As already stated, the lower Court introduced into a purely judicial function a concept of political science entirely unrelated to the issue before it. For instance

it said: "we are dealing with the public's own right to enjoin legislation by a device, that of public debate, which is as democratic as the New England town meeting or the ballot itself." How does the New England town meeting enter into this? Is it suggested that the two million inhabitants of Philadelphia shall assemble in one convention hall to debate the questions which are submitted by the City Council? Is there not a better way than the over-romanticized idea of a New England town meeting to consider matters of importance to the City? What more democratic method to ascertain the will of the people could be devised than that of allowing each voter to enter into a voting poll and there, alone with his conscience, answer yes or no to question or questions propounded to him?

On February 3, 1956, in accordance with the requirement of the Home Rule Charter and the Enabling Act, the Committee on Law and Government of the City Council gave notice through the three major newspapers in Philadelphia that a public hearing would be held on February 8, 1956, to consider the ordinance which is the subject of this controversy. The hearing took place. The public appeared and discussion followed. The ordinance as originally written provided that all officers and employes of elected offices in the City were to be exempted from civil service. After the hearing the Committee omitted the Mayor's office from the provisions of the ordinance and, in this amended state, reported it to Council for passage which then did in fact pass it. Thus, Council enacted an ordinance which was exactly as proposed except that it covered one office less than originally proposed. The Court of Common Pleas saw in this curtailment of the scope of the ordinance a substantial change which required another public hearing on the measure. Why? What would another public hearing have accomplished? City

Solicitor David Berger in his able brief makes this significant statement: "At the hearing on the Resolution, the very change here involved was discussed and as a result thereof, as well as of other comments prior to the hearing, the Council determined to make the revision which it did by removing the office of the Mayor from the coverage of the amendments."

If the change involved was discussed, and this has not been denied by the plaintiffs, the holding of another hearing would supply no more enlightenment on the subject than an oft-played phonograph record. The lower Court says: "The City's argument that the amending change was 'clarifying' is a quibble." I believe the Court's statement to be unfair. Using the Court's own phrase, I would say that its further comment that "the Council has changed the array of offices without giving the public its right to be heard" will be distinguished in the records of the court as a quibble that is rarely found in judicial dissertations.

The lower Court's Opinion reads as if City Council had acted clandestinely, surreptitiously, and with guards at the doors to keep the public away. The facts, of course, could not be more to the contrary. Not only was the public invited to be present at the Councilmanic hearing, not only was there a discussion of the very amendment later adopted, not only did the newspapers carry stories, articles and editorials on the subject of the Charter amendment, but radio and television programs introduced the debate into the homes of practically all the voters in Philadelphia. To say that the public was denied the right to be heard is a quibble which passes through the realm of sophistry into the area denominated by Shakespeare as "lame and impotent conclusion."*

---

* Othello, Act II, Sc. 1.

It was admitted by plaintiffs' counsel at the oral argument before our Court that if the resolution had been passed as originally introduced it would have fulfilled every requirement of the law. The original resolution excluded six offices from civil service, the amended ordinance excluded five. If a whole orange is good, why would five-sixths of the same orange be bad? Since, as already stated, the plaintiffs object to excluding any office from civil service, and they are confronted with the possibility of an exclusion of six offices, why shouldn't they be happy that that exclusion has been reduced to five instead of six?

As sparse as is the record submitted to us for review, I cannot avoid the conclusion that the plaintiffs are thrusting forward the phantom of an alleged parliamentary defect as a means of arguing their aversion to all civil service exclusions. In doing this, they are clothing the shadow of a naked technicality with the garments of a political philosophy. The Court below similarly allowed its ideas on the subject of political science to dictate its judgment on a question which was strictly one of legal procedure. The Majority of this Court, by affirming the lower Court's decision, has repeated the error. But it has done more—and worse.

The lower Court at least only invalidated the proposed referendum for the present. The assumed parliamentary defect on which it hung its decision could easily be remedied by Council taking up the subject matter at another session and conducting the hearing which the lower Court felt was required. But the Majority here has done the appalling thing of entombing forever the right of the people to pass on the questions under discussion and all others akin to them. That is, the Majority has *attempted* to bury this right forever. I do not believe it will succeed in this attempt to strait-jacket the future. The bare majority (of one

Justice) with which this staggering blow to the people's rights has been accomplished will melt as the snows of yesteryear, under the light of a later consideration; and the sovereign prerogative of the people to determine the nature of their own government will eventually prevail, as it always does.

While it would be too much to hope that the present Majority would change its mind on the subject, there would be precedent for even that consummation— it would be possible for at least two of the Justices of the instant evanescent Majority to change their minds since they have done it before on this very subject.

The Court says that City Council cannot exercise a power which is denied the Legislature. In *Clark v. Meade,* 377 Pa. 150, the Majority of this Court held that the Legislature could not pass a law permitting employees of the offices of Sheriff, City Commissioners, Board of Revision of Taxes, and Registration Commission to engage in political activities. However, Chief Justice STERN and Justice CHIDSEY specifically declared in their Concurring Opinion in that case that Philadelphia could not be denied the right to authorize the granting of political privileges even though the Legislature could not. If that was good law in March, 1954, why is it not good law in April, 1956? The Justices said in 1954: "It has been suggested that the result of the majority opinion will be to make it constitutionally impossible, even for the people of Philadelphia, to disestablish civil service or to permit the employees of some of the City departments, and not others, to be politically active. That question is likewise not here involved. But, since it has been injected into the discussion, *it is not amiss to point out that we are neither holding nor even implying that a resolution of Council, approved by a vote of the people (the procedure for amending the Charter), is the passage of a*

*law within the contemplation of Article III, Section 7, of the Constitution whose operative prohibitions are directed against the passage by the legislature of certain laws."**

The Majority says that *Clark v. Meade* is authority for their decision of today, but in that very case the Majority specifically excluded that that decision could be used as authoritative of the question before us here. Chief Justice STERN and Justice CHIDSEY said: *"We are not passing,* either expressly or impliedly, upon the general power of the legislature to enact laws regulating the affairs of the City, nor *upon the power of the Council of the City by resolution, approved by a vote of the people, to amend the Charter in any manner that may be desired,* as provided by the First Class City Home Rule Act of April 21, 1949, P. L. 665."

The Majority holds that by operation of Article III, Section 7 of the Pennsylvania Constitution, the local government of Philadelphia is prohibited, like the Legislature, from passing any "local or special law". If we are to give to precedent something more than a passing nod of recognition, this question is no longer open for contemplation. As far back as 1887 this Court said: *"The object of the constitutional provision was clearly to prevent the legislature from interfering in local affairs by means of special legislation; and, if the town councils of cities and boroughs cannot regulate them, they are in a bad way indeed.* The principle contended for would prevent the town councils of a city or borough from passing an ordinance to pave one street, unless it also provided for the paving of all the other streets within the limits of the municipality." (Klingler v. Bickel, 117 Pa. 327, 337).

---

* Italics throughout, mine.

I have noted lately in Court decisions a most distressing disposition toward giving to phrases a meaning entirely different from the plain intent of the words of which the phrase is composed. Article III, Section 7 of the Constitution says: *"The General Assembly shall not pass any local or special law."* How can the Majority torture the words "General Assembly" into meaning anything other than what they say? Justice BELL made the matter very clear when he said in *Commonwealth ex rel. Truscott v. Philadelphia,* 380 Pa. 367, 376: "the words 'General Assembly' mean the legislature, and in every village, township and farm they likewise know the difference between the General Assembly or State Legislature and a local council."

The Majority says further that the City Council of Philadelphia may not submit to the people of Philadelphia the questions proposed because to do so would violate the Constitution prohibiting the "granting to any . . . individual any special or exclusive privilege or immunity." What is the special privilege or immunity which the City Council is granting? If approved by the people, the Charter amendment would give to certain American citizens the right which the Constitution already guarantees to every one in Pennsylvania: the right to participate in that activity which keeps America the greatest democracy in the world. The phrase "special or exclusive privilege or immunity" cannot by the farthest stretch of language and imagination mean political privileges. It will be noted that the phrase includes the word "exclusive." What is exclusive about the right to discuss governmental problems, to recommend one candidate over another, to urge one's friends to vote and to support certain issues? These are not immunities or exclusive privileges; they are the very breath of our nostrils in America. To say that political activity constitutes an "exclusive privi-

lege or immunity" is to confuse Pennsylvania with Czecho-Slovakia and Philadelphia with Bucharest.

How is anyone injured—morally, physically, or in any other way—if an employee in the offices here contemplated will, after his work of the day, join with his neighbors in enjoying to the fullest all that American citizenship allows in helping to shape the civic destiny of the community, the State, and the Nation? If a law were enacted prohibiting employees of private firms from engaging in political activities, this Court would at once and properly declare it unconstitutional as an abridgment of the rights of citizenship. Why should the abridgment be any the less when it applies to an employee of the government itself? Who should know more about government than those who work in it and for it? Who should be more qualified to talk about the operation of government and ways for improving it than the very ones who live with it from day to day?

The decision of today not only violates the Constitution, and runs counter to expressed law, but it propounds a very bad policy as well. It suggests that there is something evil in political activity although it does not state what that evil is. Everywhere citizens are being urged to vote, but to vote ignorantly or blindly is worse than not voting at all because abstention at least prevents the casting of a vote for one unworthy of office. What the voter needs is not to be urged to vote but to be given an incentive to vote, and that incentive will come from an awareness of issues, a knowledge of what candidates stand for, and the objectives of the parties. The dissemination of helpful information is facilitated by allowing "political privileges" to those in government. Allowing these so-called political privileges to employees who are active in party affairs does not confer any special advantage to one

party over the other because naturally the political privilege would apply equally to members of both parties.

The Majority sees disconcerting irregularity in allowing "assistants, clerks, stenographers and others in some offices to be politically active, while denying the same privilege to employes in other offices performing the same type of work and under the same classification." But in this respect the Majority is disconcerted unnecessarily. The Charter itself provides for variation on the subject of those entitled to be "politically active." Section 7-301 of the Charter specifically *excepts* from civil service: "(a) All officers elected by the people and their deputies, and employees appointed by the members of the Council; (b) The Managing Director, the Director of Finance and the Personnel Director and their deputies, the heads of departments and their deputies, and members of boards and commissions but the number of exempt deputies in any department other than the Law Department, shall not exceed two; (c) Such secretaries and clerks as the Mayor may require and one secretary or clerk for each head of a department, the Director of Finance, the Managing Director, the Personnel Director, the City Representative and the City Treasurer, and one principal assistant or executive director for each board or commission; (d) Persons employed by contract to perform special services for the City, where such contract is certified by the Civil Service Commission to be for employment which cannot be performed by persons in the civil service; (e) Persons temporarily appointed or designated to make or conduct a special inquiry, investigation, or examination, or to perform a special service, where such appointment or designation is certified by the Civil Service Commission to be for employment which because of its expert or unique character could

not or should not be performed by persons in the civil service; (f) Persons who in times of public emergency may be appointed special employees for service not to exceed one month in duration."

The Majority says that if the City of Philadelphia "could arbitrarily grant to an assistant, a clerk, a stenographer, a telephone operator, or any other employe in one of the City's governmental offices the right to engage in political activities while denying the same privilege to a similar employe in another office, it could similarly grant, let us say, to one store or one factory a privilege that it denies to another of exactly the same kind." But as the above enumeration of exemptions from civil service conclusively demonstrates, the Charter actually provides for what the Majority derides. It could well happen that a secretary typing at one machine would be under civil service while the girl next to her would not be subject to civil service restrictions. The framers of the Charter realized that political necessities of municipal government make uniformity in civil service application as impossible as uniformity in women's dresses or coiffure. The framers of the Charter went to pains to explain this in an official annotation: "The exemptions allowed take cognizance of political necessities of municipal government . . .; supervisory offices necessary for effective municipal administration . . .; the fostering and protecting of necessary personal and confidential relationships . . .; the need for special or expert services by contract or on a temporary basis or employment in cases of public emergencies . . . ."

What the Majority calls an "arbitrary grant" is a rationalized procedure. I fail to see in the illustration above given by the Majority any comparison between the sovereign rights of a citizen to engage in affairs of government and the claim of a store or factory

owners for certain privileges which may be dependent upon a hundred different considerations such as traffic, health, sanitation, etc., etc. The whole fault in the Majority rationale, as I see it, is that it treats the rights of Pennsylvanians as if they were the products of factories instead of according to them the sacred protection due them under the Constitution and the law of the land.

This is a sad day for democracy, all so unnecessary— and I dissent.