Edward M. MAZUR, Jeffrey D. Bull and Citizens Against Tax Increment Financing, Appellants

v.

WASHINGTON COUNTY REDEVELOPMENT AUTHORITY and South Strabane Township.

Commonwealth Court of Pennsylvania.

Argued May 6, 2008.

Decided July 11, 2008.

Reargument and/or Reconsideration Denied Sept. 4, 2008.

Jody Rosenberg, Pittsburgh, for appellants.

Colin E. Fitch, Washington, for appellee, Washington County Redevelopment Authority.

Thomas A. Lonich, Washington, for appellee, South Strabane Township.

Dusty E. Kirk, Pittsburgh, for amicus curiae, Tanger Properties Ltd. Partnership.

BEFORE: McGINLEY, Judge, and SMITH–RIBNER, Judge, and KELLEY, Senior Judge.

OPINION BY Judge SMITH–RIBNER.

Edward M. Mazur, Jeffrey D. Bull and Citizens Against Tax Increment Financing (Taxpayers) appeal from an order of the Court of Common Pleas of Washington County (trial court) that sustained preliminary objections and dismissed Taxpayers' complaint seeking declaratory and injunctive relief against Washington County Redevelopment Authority (Redevelopment Authority) and South Strabane Township (Township) for lack of a ripe controversy. Taxpayers question whether the trial court abused its discretion and committed an error of law in ruling that they failed to allege adequate facts to present a ripe controversy.

### I

In two opinions issued by Judge Katherine B. Emery, the trial court noted that the present case involves another legal challenge to the Tax Increment Financing Plan (TIF Plan) to construct the Victory Centre Development Project (Victory Centre) on approximately 333 acres at the intersection of Race Track Road and Interstate 79 in the Township. The $365,150,000 Victory Centre is to be anchored by two major developments, Tanger Outlets (Tanger) and Bass Pro Shops (Bass Pro), and will combine a Tanger Outlet Mall, a Bass Pro store, hotels, restaurants and a variety of entertainment opportunities. The Tanger development, at 517,000 square feet, is to cost approximately $77,800,000, and the Bass Pro development, at 866,000 square feet, is to cost approximately $287,350,000.

Victory Centre is to be funded in part through the mechanism created by the Tax Increment Financing Act (TIF Act), Act of July 11, 1990, P.L. 465, *as amended,* 53 P.S. §§ 6930.1–6930.13.[1] The governing bodies of Washington County, the Township and Trinity Area School District (taxing bodies) formed a TIF Committee. The Redevelopment Authority presented its proposal at a public meeting of the TIF Committee calling for each of the taxing bodies to allocate 80 percent of the tax increment to the Authority for payment of the TIF loan and 20 percent to each taxing district. The taxing bodies adopted the proposal, and the Township created the TIF District and declared it to be a "blighted" area as required by Section 5(a)(6)(iv)(H), 53 P.S. § 6930.5(a)(6)(iv)(H). The TIF Plan also provided for creation of a Neighborhood Improvement District (NID), under the Neighborhood Improvement District Act (NID Act), Act of December 20, 2000, P.L. 949, 73 P.S. §§ 831–840. The Authority planned to issue $27,210,000 in bonds: $14,462,115 in TIF funding and $12,747,885 in NID funding. The TIF Plan provides for debt on the bonds to be retired in 20 years by increased property tax revenues within the TIF District and increased business taxes within the NID.[2]

---

1. Tax increment financing is "a technique used by a municipality to finance commercial developments [usually] involving issuing bonds to finance land acquisition and other up-front costs, and then using the additional property taxes generated from the new development to service the debt." *Ondek v. Allegheny County Council,* 860 A.2d 644, 645 n2 (Pa.Cmwlth.2004) (quoting Black's Law Dictionary 1502 (8th ed.2004)). Section 2(a)(3) of the TIF Act, 53 P.S. § 6930.2(a)(3), states that its purpose is to "provide an alternative method for use by authorities in pursuing redevelopment efforts under the Urban Redevelopment Law [Act of May 24, 1945, P.L. 991, *as amended,* 35 P.S. §§ 1701–1719.2] and other applicable laws." The Victory Centre TIF Plan states that the taxing bodies that stand to benefit from the development through increased assessment valuation should cooperate in the efforts to finance the cost of public infrastructure improvements.

Taxpayers filed an amended complaint January 30, 2007 alleging that on December 28, 2006, the Redevelopment Authority issued bonds for the Tanger development of approximately $23,000,000 (2006 Bonds), or approximately 85 percent of the entire amount of available bond funding, and that as a result no tax increment revenues from the Bass Pro development would be available to pay debt service on the loans. Bass Pro was to be open for business in September 2007. From the delay in construction schedules and issuance of most of the bonds to Tanger, Taxpayers concluded that Bass Pro is not a definite component of Victory Centre and that, if it does not come to fruition, there will have been a "substantial deviation" from the TIF. Plan, which would require an amendment under Section 5(a)(8) of the TIF Act, 53 P.S. § 6930.5(a)(8), and *Mercurio v. Allegheny County Redevelopment Authority,* 839 A.2d 1196 (Pa.Cmwlth.2003).

The amended complaint alleged (1) that issuance of $23,000,000 in bonds to Tanger was an *ultra vires* act because the amount did not correlate to Tanger's proportion of the total cost; (2) that the Redevelopment Authority may not issue bonds to the Tanger development alone; and (3) that the TIF Plan is invalid unless amended. Taxpayers requested a declaration that Victory Centre as it is currently progressing no longer reflects the TIF Plan and that issuance of the bonds was illegal and sought an injunction prohibiting the Redevelopment Authority from acting further. The defendants filed preliminary objections, including their assertions that Taxpayers lack standing and that the suit lacks a ripe controversy.

The trial court addressed the threshold issue of whether Taxpayers had standing based on their status as taxpayers in the TIF District. The defendants cited *Application of Biester,* 487 Pa. 438, 409 A.2d 848 (1979), for the general rule that taxpayers do not have standing to sue simply because they wish to prevent the waste of tax revenue. That case, however, provided a five-part test that applies only when taxpayers challenge obligations placed on the public or government emoluments, which was summarized in *Consumer Party of Pennsylvania v. Commonwealth,* 510 Pa. 158, 170, 507 A.2d 323, 329 (1986) ("1. the governmental action would otherwise go unchallenged; 2. those directly and immediately affected ... are beneficially affected and not inclined to challenge the action; 3. judicial relief is appropriate; 4. redress through other channels is unavailable; and 5. no other persons are better situated to assert the claim"), *abrogated in part on other grounds by Pennsylvanians Against Gambling Expansion Fund, Inc. v. Commonwealth,* 583 Pa. 275, 877 A.2d 383 (2005). The trial court concluded that Taxpayers met this test, and it ruled that they have standing.

■ On the objections asserting lack of ripeness, the trial court noted the purpose of the Declaratory Judgments Act "to settle and to afford relief from uncertainty and insecurity with respect to rights, status, and other legal relations...." 42 Pa. C.S. § 7541(a). A declaratory judgment may be obtained only where there is a real

---

**2.** Amicus Tanger Properties Limited Partnership explains that the NID Act permits property owners such as Tanger and Bass Pro to authorize special assessments on their property to raise funds for public infrastructure improvements. After enacting an NID Plan, municipalities may issue bonds to raise money for the project; the principal and interest are paid off by the property owner who raises the money through the special assessment. Thus NID bonds represent private investment in a project and are not backed by public funds.

controversy, *Gulnac by Gulnac v. South Butler County School District*, 526 Pa. 483, 587 A.2d 699 (1991), and it must not be employed to determine rights in anticipation of events that may never occur or for consideration of moot cases or for the rendition of an advisory opinion that may prove to be academic. *City of Philadelphia v. Philadelphia Transp. Co.*, 404 Pa. 282, 171 A.2d 768 (1961). The trial court quoted Section 5(a)(4) of the TIF Act, 53 P.S. § 6930.5(a)(4), as to the information required to be included in a TIF Plan.[3] It noted that Section 5(a)(8), 53 P.S. § 6930.5(a)(8), provides: "The governing body of the municipality creating the tax increment district may at any time, subject to the provisions of section 6(c), adopt an amendment to a project plan which shall be subject to approval in the same manner as the original project plan."

Taxpayers relied heavily upon *Mercurio*. The Court noted there that after the Department of Environmental Protection denied a permit to the developer of a project, an amended permit application was submitted that contained many changes from the TIF Plan, including an expansion of a state road from four to six or eight lanes, a new bridge and culvert, the elimination of a movie theatre, entertainment complex and self-storage facility and the addition of a hotel resulting in a three-year delay in construction. The Court held that, although Section 5(a)(8) regarding adoption of amendments is permissive, the directive to amend the TIF Plan should not be flouted. Without some type of check on a TIF Plan's progress and evolution, infor-

mal modification could lead to "a situation where a developer submits a 'pie in the sky' proposal that promises the government entities that a project will generate greater increases in tax revenues." *Mercurio*, 839 A.2d at 1205. After the project plan is approved the developer could build an entirely different project, which could generate less tax revenues. As the changes alleged might, if proved, amount to substantial changes, the Court reversed the sustaining of a preliminary objection on that point and remanded for further proceedings.

■ Taxpayers' amended complaint made bald assertions that Bass Pro could be eliminated from Victory Centre, and they sought such an inference based on the lopsided bond issuance. The trial court cited *Mazur v. Trinity Area School District*, 926 A.2d 1260 (Pa.Cmwlth.2007), *appeal granted in part*, 596 Pa. 206, 941 A.2d 1256 (2008), for the proposition that courts may not rule on the wisdom of legislative enactments (*e.g.*, to create a TIF Plan), and thus the precise manner of carrying out the TIF Plan was not subject to review. No well-pleaded facts permitted a determination that Victory Centre had experienced the kind of drastic changes involved in *Mercurio*. The trial court concluded that there was no ripe controversy because only one of the TIF bonds had been issued and that it was too early in the construction process to determine whether a substantial deviation from the TIF Plan had occurred.[4]

---

3. Section 5(a)(4) requires inclusion of, among other items: (i) a statement listing the kind, number and location of all proposed public works or improvements and/or all residential, commercial or industrial development and revitalization improvements; (ii) an economic feasibility study of the project and the fiscal effects on the municipal tax base; (iii) a detailed list of estimated project costs; and (iv)

a description of the methods of financing all estimated project costs and the time when related costs or monetary obligations are to be incurred.

4. Whether a matter is ripe for judicial review is a question of law over which the Court's review is plenary. *Township of Derry v. Pennsylvania Department of Labor and Industry*,

## II

Taxpayers argue that if substantial changes are made to the TIF project after adoption of the TIF Plan in regard to any information required by Section 5(a)(4) of the TIF Act to be in the plan, then under *Mercurio* the governing body must adopt an amendment subject to approval in the same manner as the original plan. Construction of the Tanger and Bass Pro projects was to proceed concurrently. The TIF Plan allocated $14,400,000 of TIF funds to pay for infrastructure improvement, and, according to the TIF Plan, Tanger and Bass Pro proposed an NID that would provide an additional $12,700,000. In regard to TIF debt service only, the TIF Plan listed Tanger as ultimately providing $9,626,146 and Bass Pro as providing $13,655,016.

On December 28, 2006, the Redevelopment Authority issued bonds in the actual amount of $23,585,000. *See* 2006 Bonds, Supplemental Reproduced Record 40b. They represent 87 percent of the total bond funding contemplated by the TIF Plan, but they were issued to pay for construction and development of public infrastructure for the Tanger Outlet component alone. The indenture of trust refers to a possible future bond issuance, although the Improvement Area B Developer is defined as Bass Pro or any other developer who issues a funding agreement with the issuer, and the documents make clear that any tax revenues generated by Bass Pro will not be available for payment on the 2006 Bonds under any circumstance.

Taxpayers submit that the matter is ripe because the ultimate action authorized by the TIF Plan (issuance of TIF bonds) has occurred and has occurred in a manner inconsistent with the TIF Plan. They state that the Redevelopment Authority has bound the taxing bodies to pay the debt on this bond issuance from new tax revenues generated by Tanger alone. The trial court concluded that it was too early to know whether Victory Centre was proceeding reasonably as set forth in the TIF Plan or whether changes amounted to a substantial deviation, but Taxpayers contend that this goes to the merits of the case and not its ripeness.[5]

Taxpayers note that if projections for fiscal effects on the municipal tax base change, the taxing bodies must amend the TIF Plan to reflect the changes. The TIF procedure requires at least one public hearing on a proposed TIF Plan. Taxpayers cite *Schultz v. Philadelphia*, 385 Pa. 79, 122 A.2d 279 (1956), stating that the object of a public hearing is to enable the legislative body to ascertain preliminarily

593 Pa. 480, 932 A.2d 56 (2007). In determining whether a matter is ripe for judicial review, "courts generally consider whether the issues are adequately developed and the hardships that the parties will suffer if review is delayed." *Id.*, 593 Pa. at 485, 932 A.2d at 60.

5. Taxpayers elaborate that the TIF Plan speaks in terms of a single "bond," but the issuance of the 2006 Bonds only for costs in connection with development of the Tanger project means that the taxing bodies will not receive the benefit of the concurrent construction of the Tanger and Bass Pro projects and that Bass Pro is not legally bound to develop anything. The TIF Plan projected economic feasibility based upon two major commercial developers, but the 2006 Bond issuance does not include two developers. Further, the TIF Plan contemplated dedicating tax revenues over twenty years of $23,281,162 to pay for infrastructure improvements to attract over $300,000,000 in private investment, but now the Redevelopment Authority used $14,157,553 of public funds to leverage only some $77,000,000. Taxes on Tanger are the exclusive means to repay the 2006 Bonds so its paying more than specified in the TIF Plan means a loss to the taxing bodies whether Bass Pro builds or not.

the views of the public in regard to proposed legislation and if those views are not sought after substantial amendment the purpose of the procedure is defeated. They submit that the changes to the TIF Plan are even more substantial than those in *Mercurio* and that they have alleged the elimination of a majority of the commercial development and a change in tax revenue projections. They note, the "pie in the sky" reference in *Mercurio* and contend that the taxing bodies are "on the hook" to finance the bonds without any guarantee that Bass Pro will build.

The Redevelopment Authority recites a history of three other actions filed by Taxpayers, including their challenge to rezoning granted by the Township. It notes that Section 4 of the TIF Act, 53 P.S. § 6930.4, grants a redevelopment authority, in addition to all other powers conferred by law, the right to "exercise any powers necessary and convenient to carry out the purposes of this act," including the power to issue tax increment bonds and notes and to enter into contracts or agreements as may be necessary to secure or to implement the provisions and effectuate the purposes of TIF plans.

■ The Redevelopment Authority first argues that Taxpayers lack standing to sue. In *Biester* the Supreme Court rejected a taxpayer's petition to set aside the Attorney General's application to summon a statewide investigating grand jury, stressing that in the absence of special circumstances the common interest of prevention of waste of tax revenues is the same interest that all citizens have in seeing that others comply with the law. In *Boady v. Philadelphia Municipal Authority*, 699 A.2d 1358 (Pa.Cmwlth.1997), a disappointed bidder on an HVAC contract filed a suit claiming the city violated the law by substituting less expensive, lower quality equipment than was required by the contract. The Court applied the five-part test for taxpayer standing derived from *Biester* and affirmed dismissal for lack of standing, reasoning that government officials, not taxpaying members of the public, are charged with interpreting contracts.[6]

The Redevelopment Authority further argues that Taxpayers cannot satisfy the third prong of the *Biester* test, namely, showing that judicial relief is appropriate. It cites *Schenck v. Pittsburgh*, 364 Pa. 31, 70 A.2d 612 (1950), where an objecting property owner argued that mere certification of a parcel as blighted did not conclusively establish that it would be used for a public purpose, but the Supreme Court stated that in the absence of any indication that the agency acted in bad faith or was wholly arbitrary in certifying the area, a certification was not subject to judicial review. The Redevelopment Authority contends by analogy that Taxpayers are trying to impose their view of the propriety of the TIF project on the Authority. In *Stilp v. Commonwealth, General Assembly*, 596 Pa. 62, 940 A.2d 1227 (2007), where a

---

6. The Redevelopment Authority cites provisions of Section 1 of the TIF Act, added by Section 3 of the Act of December 16, 1992, P.L. 1240, 53 P.S. § 6930.9a, and Section 10, 53 P.S. § 6930.10, which provide that the Secretary of Commerce may promulgate regulations necessary to carry out the TIF Act and that the Department of Commerce (now Department of Community and Economic Development) in cooperation with other state agencies and local governments, shall make a comprehensive report to the Governor and the General Assembly every two years as to the social, economic and financial effect of TIF projects. These provisions do not on their face provide for close scrutiny of TIF projects or for a means of redress for claims such as those presented here or establish any agency as better situated to act as was the case in *Reich v. Berks County Intermediate Unit No. 14*, 861 A.2d 1005 (Pa.Cmwlth.2004).

citizen sought a declaratory judgment that the Auditor General had authority to audit the General Assembly, the Supreme Court ruled that the citizen lacked standing, citing as sufficient the fifth factor of the *Biester* test, because the Auditor General as an elected official was far better situated to bring a declaratory judgment action on that question. The Redevelopment Authority asserts that the taxing bodies are the equivalent here.

The Court concludes that the trial court was correct in its ruling on standing. As it noted, the government action would otherwise go unchallenged; those directly and immediately affected are affected beneficially and so are not likely to challenge; redress through other channels is unavailable and no other persons are better situated to assert the claim. As for the third factor, whether judicial relief is appropriate, the Court agrees that *Mercurio* certainly has established that judicial relief may be appropriate in a proper case. The Court has set the bar high and has not encouraged casual interference in the affairs of a TIF project; nevertheless, in a case involving proof of substantial changes from an approved TIF Plan, a judicial check is necessary and appropriate. *Mercurio.*

▮ On the question of ripeness, the Redevelopment Authority argues that no actual controversy exists because the TIF Plan refers to TIF revenues and NID revenues, not the amount of bonds issued. Further, the TIF Plan contemplates two separate financings for Tanger and Bass Pro and contemplates that NID funds would be used to pay a portion of the debt financing for each. Taxpayers' argument regarding the effect of the 2006 Bonds is clearly speculative. Also, until Tanger builds its project and is assessed for real estate tax purposes, no TIF revenue is generated and all debt service will be paid by the developers from NID revenues. As for *Mercurio*, it notes that this Court's decision did not address standing; further, there was a delay of three years and evidence of a denial of a permit resulting in a change in what could be built, and major elements such as a movie theater, entertainment complex and self-storage facility had been deleted.

The Township stresses Taxpayers' present focus on the fact that bonds will be issued in two series and their statements that the Redevelopment Authority has foisted the risk that Bass Pro might not build on the taxing bodies and the taxpayers. The Township points out that the bonds provide in several places in all upper case and bolded text that they are not general obligations and are not backed by the taxing power of any of the government entities involved (other than TIF and NID revenues). Nothing precludes two bond issuances, and the $27,210,000 figure has not changed nor has the TIF portion of $14,462,000. Taxpayers' assertions that Bass Pro's participation is uncertain are speculative, and delay has been caused by Taxpayers' actions. The President of Bass Pro, at a public hearing on August 15, 2006 as part of the creation of the NID, stated that Bass Pro would move forward as soon as there was a final resolution to legal challenges and certainty from the Department of Transportation as to completion of the interchange.

The Court ultimately concludes that the trial court did not err in deciding that this matter does not currently present a ripe controversy. Unlike the situation in *Mercurio* where substantial changes in the development from what was contained in the approved TIF Plan were alleged and were readily subject to proof upon remand, here Taxpayers have offered only speculation that Bass Pro might withdraw from the project. Taxpayers contend that the Re-

development Authority issued bonds for Tanger alone, but the record shows that the TIF Plan remains in effect and that further bonds are intended to be issued to support the Bass Pro component of Victory Centre. If Bass Pro were to withdraw from participation in Victory Centre, and the Redevelopment Authority failed to seek an amendment to the TIF Plan, there would be a ripe controversy. At present, however, there are no allegations of the type of substantial changes to the TIF Plan that the Court held in *Mercurio* justified an amendment to the TIF Plan, secured through the means of judicial proceedings if necessary.[7] Accordingly, the Court affirms the order of the trial court dismissing this action by Taxpayers for lack of a ripe controversy.

### ORDER

AND NOW, this 11th day of July, 2008, the order of the Court of Common Pleas of Washington County is affirmed.

---

7. Amicus Tanger Properties Limited Partnership argues that Taxpayers fail to allege a substantial change; they allege only that the TIF Plan is changed because Bass Pro is delayed. Here, unlike in *Mercurio*, the size and scope of the development have not changed, with two developers still developing the site, no buildings or planned uses eliminated, no scaling back of revenue projections, delay of the Bass Pro development that is not unexpected, an increase in the projected assessments and no massive additional road improvements. Taxpayers do not allege that Bass Pro withdrew or that it will withdraw. It recently closed on purchase of property that is part of the Victory Centre development, as shown by the deed attached as Exhibit A to the Redevelopment Authority's motion to modify the record. The Court by order of March 6, 2008 granted the motion as to that exhibit solely on the issue of whether Bass Pro may withdraw.